CORNELIUS RAY, JOHN LANSING, JUN. AND CORNELIA, HIS WIFE, *Appellants, against* ANN BOGART, CORNELIUS N. BOGART, DAVID S. BOGART, HELENA BOGART, AND CARY LUDLOW, *Respondents.*

Where A. B. and C. entered into partnership in trade, in 1767, and continued business until May, 1774, when B. died, and the partnership was thereby dissolved, and C. afterwards died in 1782, and A. in 1788, without the partnership accounts having been settled ; and in 1794, the representatives of A. filed a bill in chancery against the representatives of the other partners, for an examination and settlement of accounts, and for the payment of a balance claimed ; the court dismissed the bill on account of the lapse of time and the death of the parties, considering it as a stale demand.

HENRY C. BOGART, Robert Ray and Daniel Stiles, some time in the year 1757 entered into partnership for the pur-

Ray and others v. Bogart and others.

pose of merchandising and distilling. It was virtually agreed between them, that they should equally divide the profits, and bear the loss arising from the business.

Robert Ray conducted the business in his own name, for

ejectment, and may well be left to the common tribunals. (*Jones* v. *Jones*, 3 Meriv. Rep. 161.) And it has accordingly been laid down in some of the American courts, that, under such circumstances, where the verdict of a jury is necessary to ascertain the extent of the relief, the plaintiff should be left to his action at law after the discovery is obtained. (*Lynch* v. *Sumrall*, 1 Marsh Kentucky Rep. 469.)

" The distinction here pointed out furnishes a clear line for the exercise of equity jurisdiction in cases where relief is sought upon bills of discovery ; and, if it should receive a general sanction in the American courts, it will greatly diminish the embarrassments which have hitherto attended many investigations of the subject. In the present state of the authorities, however, little more can be absolutely affirmed than these propositions : first, that in bills of discovery seeking relief, if any part of the relief sought be of an equitable nature, the court will retain the bill for complete relief ; secondly, that in matters of account, fraud, mistake and accident the jurisdiction for relief will, generally, but not universally, be retained and favored ; and thirdly, that in cases where the remedy at law is more appropriate than the remedy in equity, or the verdict of a jury is indispensable to the relief sought, the jurisdiction will either be declined, or if retained, will be so subject to a trial at law.

" From what has been already stated, it is manifest that the jurisdiction in cases of this sort, attaches in equity solely on the ground of discovery. If therefore, the discovery is not obtained, or it is used as a mere pretence to give jurisdiction, it would be a gross abuse to entertain the suit in equity, when the whole foundation on which it rests is either disproved or it is shown to be a colorable disguise for the purpose of changing the forum of litigation. Hence, to maintain the jurisdiction for relief, as consequent on discovery, it is necessary, in the first place, to allege in the bill that the facts are material to the plaintiff's case, and that the discovery of them by the defendant is indispensable as proof ; for if the facts lie within the knowledge of witnesses, who may be called in a court of law, that furnishes a sufficient reason for a court of equity to refuse its aid. The bill must, therefore allege, (and if required the fact must be established,) that the plaintiff is unable to prove such facts by other testimony. (*Gelston* v. *Hoyt*, 1 Johns. Ch. Rep. 543. *Seymour* v. *Seymour*, 4 Johns. Ch. Rep. 409. *Pryor* v. *Adams*, 1 Call Rep. 382. *Duvalls* v. *Ross*, 2 Munf. Rep. 290, 296. *Bass* v. *Bass*, 4 H. & Munf. 478.) In the next place, if the answer wholly denies the matters of fact, of which discovery is sought by the bill, the latter must be dismissed ; for the jurisdiction substantially fails by such a denial.' (*Russell* v. *Clark's Executors*, 7 Cranch, 69. *Ferguson* v. *Waters*, 3 Bibb's Rep. 303. *Nourse* v. *Gregory*, 3 Litt. 378. *Robinson* v. *Gilbraith*, 4 Bibb's Rep. 184." 1 Story's Comm. on Eq. Jur. ed. 1846, §§ 71, 72, 73, 74.)

the account of the partnership, from the commencement of the firm until the 13th October, 1773.

Some time after the commencement of the business, but how long is uncertain, a dispute having arisen between Robert Ray and Henry C. Bogart, on account of the former charging a commission for being the active partner, amounting to a considerable sum, on which Henry C. Bogart offered to take the management of the business upon himself without commission ; and accordingly Ray, on the 13th day of October, 1773, resigned to Bogart the care of their concerns.

Henry C. Bogart continued the active partner without an allowance therefor, until the time of his death, which happened some time in the month of May, 1774. [*433]     *Cornelius Bogart, father of Henry C. Bogart, and Nicholas C. Bogart, brother of Henry, were appointed executors by the will of Henry C. Bogart, and continued to reside in the city of New York, where Robert Ray also resided, until some time in the year 1776, when they were exiled, in consequence of an invasion by the British forces. But Nicholas C. Bogart never qualified as an executor ; Cornelius Bogart took possession of the whole estate ; and paid the debts which came to his knowledge.

Robert Ray lived about eighteen years after the death of H. C. Bogart, and during the greater part of that time in the same family with Cornelius Bogart.

Upon the termination of the war, Cornelius Bogart and Robert Ray returned to the city of New York. . Cornelius Bogart died in 1793, at the age of 93 years or upwards, intestate.

The accounts between the estate of Robert Ray and H. C. . Bogart respectively showed a balance against each other ; but the accounts thereof exhibited by H. C. Bogart have not been produced by the appellants ; and neither those accounts nor the materials from which they have been composed, have ever been in the possession of the respondents, or either of them.

The co-partnership was dissolved in the month of May, 1774, by the death of H. C. Bogart.

Daniel Stiles died in 1782; and his widow, and sole acting executrix, afterwards, died.

Robert Ray died in the year 1788, having made the appellants, Cornelius Ray and Cornelia, since married to John Lansing, jun. his executors. The appellants averred, that Robert Ray, on the 10th February, 1775, exhibited an account of his partnership transactions. And in a paper, which they allege to be a copy of that account, it appears, that the said Robert Ray charged 807*l*. 13*s. for commissions*, by him claimed, for transacting the partnership business, and by the same account, *Robert Ray states a balance    [*434] of 113*l*. 8*s*. 6*d*. to have been due to him.

In the same account are charges against the co-partnership, to the amount of 449*l*. 4*s*. 4*d*. for money alleged to have been advanced by Robert Ray at different periods, after he had ceased to be the active partner, to Daniel Stiles, for securing the payment of which sums, Robert Ray took promissory notes, in his own name, from Daniel Stiles.

Differences arose between H. C. Bogart, in his life-time, and the said R. Ray, respecting these accounts; but how these differences were adjusted, or if not adjusted, why no settlement thereof was made, did not appear. The books of the co-partnership have been preserved in a perfect state; and at the time of filing the bill, were in the hands of one of the witnesses in the cause.

In the year 1794, the appellants filed their bill, to compel an examination and settlement of the accounts of the co-partnership, claiming a balance to be due to them, in the manner before stated.

The respondents, by their answer, declared their utter ignorance of the matters in question; the *death of all the parties* therein concerned, and the *death of all the executors* of two of the parties, to wit, of D. Stiles and H. C. Bogart, and the great lapse of time; and insisted that under such circumstances they ought not to be compelled to an examination of those accounts.

On the hearing of the cause, his honor the chancellor was pleased to dismiss the bill, principally on account of the great and unnecessary delay and lapse of time, the death of parties, and the probable loss and destruction of papers.

From this decree, the appellants appealed to this court, for the following reasons :

[*435]     *1. By the act of law, no absolute bar is opposed to the opening and adjusting of accounts, except what is created by the statute of limitations. Every party claiming the benefit of this bar must either plead it, or insist upon it in his answer. Neither of which has been done by any of the respondents in this cause.

2. Length of time forms no absolute bar to the opening and adjusting of accounts, but only raises a presumption that accounts sought to be opened and adjusted, have in fact been settled, and that the balance struck on such settlement, has been paid to the person entitled to receive it. This presumption, like all other presumptions, will prevail, until repelled by stronger evidence, and no longer ; according to the maxim, *stabitur præsumptioni donec probetur in contrarium.* On this point, the rule of law and the rule of equity are precisely the same.

3. The presumption of settlement and payment, arising from the length of time in this cause, is repelled by the following circumstances :

1. The death of Henry C. Bogart just before the war began.

2. The intervention of the war, and the disorder it occasioned.

3. The removal of the parties from the city of New York, and their continuance without the city during the war.

4. The delicate situation in which some of the parties were placed, with respect to each other, by the nearness of their relationship, and the habits of friendship and intimacy in which they lived.

5. The extreme old age of Cornelius Bogart and his probable unfitness for the investigation and settlement of the accounts in controversy.

6. The account rendered to one of the appellants, by Nicholas C. Bogart, after the death of his father, Cornelius Bogart.

*7. No inconvenience can result to the respondents [*436] from an examination of the accounts, as the books of the co-partnership have been preserved in a perfect state. They can be commanded and must control the settlement. It cannot be a disadvantage to the respondents that the books have come to the hands of Henry C. Bogart, from those of his father, Cornelius Bogart.

8. In this view of the cause, it is supposed that no sound principle of public policy forbids the examination and adjustment of the accounts in question.

*Troup* and *Harison*, for the appellants, cited 2 Ves. 482; 1 Atk. 493; Cowp. 108, 109; 1 Term Rep. 270; 1 Fonb. Eq. 322, 324; 1 Ves. 331; 1 Vin. 186; 2 Atk. 632.

*Evertson* and *Burr*, contra, cited 2 P. Wms. 144; 2 Vern. 276; 3 Atk. 106, 107; Bunb. 217; 2 Eq. Cas. Abr. 578.

KENT, J.   Rejecting the period from May, 1775, to May, 1784, as being no reasonable time for the settlement of accounts in chancery, then, from the dissolution of the co-partnership, by the death of H. C. Bogart, in May, 1774, to the exhibition of the bill in June, 1794, is but 11 years.

Where there is a *mutual trust*, as between co-partners, I very much doubt whether the statute of limitations applies. (1 Atk. 494.   1 Fonb. Eq. 322.)   If it does apply to such a case, then it must either be pleaded or insisted on in the *answer*, or it is waived.   The rule of pleading in law and equity is equally strict.   (1 Atk. 494.   2 Ves. 483.)   The respondents insist only upon the lapse of so many years, and the death of so many parties; an objection which goes only to the *staleness* of the demand and the presumptions arising therefrom.

*A court of chancery, though the statute is not [*437] insisted on, will always exercise its discretion, in dismissing stale demands, on the ground of an unreasonable lapse of time.   But I have never met with an instance in which the court has dismissed a demand on this ground,

where only 11 years had elapsed, and when it appeared that no settlement had ever been made. There is a late case, (4 Bro. C. C. 264 to 270,) where Lord Kenyon would not suffer an account to be taken where the party had patiently slept over his demand for 33 years. There is another case in the exchequer, (Bunb. 217,) where the court would not suffer one partner to recover a balance against another, after 24 years. In another instance, (2 Bro. C. C. 62,) the court refused to open at large, an account, which had been *settled* for ten years, though certain *items* were suffered to go to the master. In other cases I find accounts have been suffered to be taken after 16, 32, and 33 years. (1 Atk. 493. 2 Ves. 483. 1 Vin. 156.)

In the present case, there was, in fact, a real *laches* only for 11 years, and there never having been a *settlement* of the accounts, and finding no instance in which the rule has been so rigorously applied, I am willing, though the presumption may be against the account, to let the experiment be made before a master, and for that purpose, I think the decree ought to be reversed.

BENSON, J. and VAN VECHTEN, S. were of the same opinion.

LANSING, Ch. J. and LEWIS J. gave no opinion.

RADCLIFF, J. was absent.

But a majority of the court being of opinion that the decree was correct, on the ground of the demand being on [*438] an old and stale account, which, under the *circumstances, ought not to be inquired into; it was thereupon ORDERED, ADJUDGED and DECREED, that the decree of the court of chancery be *affirmed.*

Judgment of affirmance.(a)

(a) Mr. Justice Story discusses the principle of this case as follows:—"It is, too, a most material ground, in all bills for an account, to ascertain, whether they are brought to open and correct errors in the account *recenti facto;* or whether the application is made after a great lapse of time. In cases of this sort, where the demand is strictly of a legal nature, or might be cognizable at law, courts of equity govern themselves by the same limitations, as to entertaining such suits, as are prescribed by the statute of limitations in re-

John B. Murray, *Appellant, against* Isaac Gouver-neur, Peter Kemble, and Samuel Gouverneur, *Respondents.*

A bill of exchange given for a precedent debt is not *payment,* unless express-ly agreed so to be by the parties.

Where A. contracted to sell a house and lot to B. and C. purchased of B. all his right, &c. it was held, that C. though a *bona fide* purchaser, without notice, must take the property subject to all the equity existing between the original parties, A. and B.

An action for *mesne profits* is an equitable suit, in which every equitable de-fence may be set up.

In the year 1796, the respondents, Isaac Gouverneur and Peter Kemble, together with Joseph Gouverneur, (since de-

gard to suits in courts of common law in matters of account. If, therefore, the ordinary limitation of such suits at law be six years, courts of equity will follow the same period of limitation. (*Hovenden* v. *Lord Annesley,* 2 Sch. & Lefr. 629. *Smith* v. *Clay,* 3 Brown Ch. Rep. 639, n.) In so doing, they do not act, in cases of this sort, (that is, in matters of concurrent jurisdiction,) so much upon the ground of analogy to the statute of limitations, as positively in obedience to such statute. (*Hovenden* v. *Lord Annesley,* 2 Sch. & Lefr. 629, 630, 631. *Spring* v. *Gray,* 5 Mason's Rep. 527, 528. *Sherwood* v. *Sut-ton,* 5 Mason's Rep. 143, 146. Story's Eq. Jur. § 55 *a.*) But where the de-mand is not of a legal nature, but is purely equitable, or where the bar of the statute is inapplicable, courts of equity have another rule, founded, sometimes upon the analogies of the law, where such analogy exists, and sometimes upon its own inherent doctrine, not to entertain stale or antiquated demands, and not to encourage laches and negligence. (*Sherman* v. *Sherman,* 2 Vern. Rep. 576. S. C. 1 Eq. Abridg. 12. *Bridges* v. *Mitchill,* Bunb. 217. S. C. Gilb. Eq. Rep. 217. *Foster* v. *Hodgson,* 19 Ves. 180, 184. *Sturt* v. *Mellish,* 2 Atk. 610. *Pomfret* v. *Lord Windsor,* 2 Ves. 472, 476, 477. *Bond* v. *Hop-kins,* 1 Sch. & Lefr. 428. *Smith* v. *Clay,* Amb. Rep. 647. 3 Bro. Ch. Rep. 639, note. *Stackhouse* v. *Barnston,* 10 Ves. 466, 467. *Moore* v. *White,* 6 Johns. Ch. Rep. 360. *Rayner* v. *Pearsall,* 3 Johns. Ch. Rep. 578. *Ellison* v. *Moffat,* 1 Johns. Ch. Rep. 46. *Sherwood* v. *Sutton,* 4 Mason's Rep. 143, 146. *Robinson* v. *Hook,* id. 139, 150, 152. *Piatt* v. *Vattier,* 9 Peters' Rep. 405. *Willison* v. *Watkins,* 3 Peters' Rep 44. *Miller* v. *M'Intyre,* 6 Peters' Rep. 61, 66. 1 Fonbl. Eq. b. 1, ch. 4, § 27, and notes. *Brownell* v. *Brown-ell,* 2 Bro. Ch. Rep. 62.) Hence, in matters of account, although not barred by the statute of limitations, courts of equity refuse to interfere after a consi-derable lapse of time, from considerations of public policy, from the difficulty

ceased, who, by his last will, appointed Isaac Gouverneur and Joseph Gouverneur his executors,) commenced an action of ejectment in the supreme court, to recover from the appellant a house and lot of ground in the city of New York.

. After the cause was ready for trial, the appellant filed his bill in chancery, stating that in August, 1795, Gouverneur and Kemble, partners in trade, and pretending to be duly authorized by Joseph Gouverneur, (who was then absent beyond seas,) made a proposal in writing, and afterwards agreed with Robert Murray, partner of the house of Robert Murray & Co. for the sale of a house and lot to the said Robert Murray & Co. for the sum of 10,000 dollars, the one-half to be paid in January, 1796, and the remaining half in May, 1797. Immediate possession was to be given to Robert Murray ; and on making the first payment, a deed was to be executed to the said Robert Murray & Co. who were to give a mortgage to secure the second payment. In pursuance *of this agreement, Robert Murray was put [*439] in possession of the premises, and continued in possession until he sold them to the appellant. The time of the first payment was postponed by mutual consent. In January, 1796, Gouverneur and Kemble, on their own account, purchased of Robert Murray & Co. bills of exchange on

of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost, and from the consciousness that the repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, *Vigilantibus, non dormientibus, jura subveniunt.* (1 Fonbl. Eq. b. 1, ch. 4, § 27, and notes. Jeremy on Eq. Jurisd. b. 3, pt. 2, ch. 5, p. 549, 550. 1 Madd. Ch. Pr. 79, 80. *Holtscomb* v. *Rivers,* 1 Ch. Cas. 127.) Mr. Fonblanque's collection of principles and authorities to illustrate this doctrine is very comprehensive, and characterized by his usual acuteness and strong sense. 1 Fonbl. Eq. b. 1, ch. 4, § 27, and notes. Mr. Jeremy also upon this subject has given us a very ample and discriminating collection of authorities. Jeremy on Eq. Jurisd. b. 3, pt. 2, ch. 5, p. 549, 550.) Under peculiar circumstances, however, excusing or justifying the delay, courts of equity will not refuse their aid in furtherance of the rights of the party ; since, in such cases, there is no pretence to insist upon laches or negligence, as a ground for dismissal of the suit. (*Lopdell* v. *Creagh,* 1 Bligh (N. S.) 255." Story's Eq. Jur. ed. 1846, vol. 1, § 529.)