KATHARINE E. SMITH, Plaintiff, *v.* MARY T. MAINE, Defendant.
DORA T. MAINE, Plaintiff, *v.* MARY T. MAINE, Defendant.

Supreme Court, Westchester County, July 30, 1932.

Smith v. Maine

*Alfred E. Smith,* for the plaintiff Katharine E. Smith.

*Harry R. Berlinicke,* for the plaintiff Dora T. Maine.

*Allan R. Campbell,* for the defendant Mary T. Maine.

TAYLOR, J. Each of these consolidated actions is brought in equity for an accounting of an alleged partnership. The first, in my memoranda deciding the issues, which memoranda will be

in two parts, will be referred to as the *Smith* action; the other as the *Maine* action. The *Smith* action has been pending since February, 1928; it went to trial before the late official referee Isaac N. Mills in July of that year, and hearings were had between then and October 8, 1928. The trial was not completed. Owing to the regrettable illness which eventuated in the death of the learned official referee, the matter was referred to me. Hearings in the consolidated actions — the *Maine* action having been commenced in December, 1928 — proceeded before me on various days from September 11, 1929, until December 5, 1930, when the same were closed. The final submission of the cause for determination was had as above stated. The testimony taken amounts to about 4,500 pages and there are numerous exhibits. This memorandum (part 1) will indicate my determination only upon the first cause of action in the second amended complaint in the *Smith* action (see *infra*). A separate memorandum (part 2) will indicate my disposition of the *Maine* action.

Dora T. Maine and Mary T. Maine are sisters. Katharine E. Smith is not related to them. She was an acquaintance of Dora for more than twenty years before the year 1928, and was associated during that time, in whatever capacity, whether as a partner or as an employee on whatever terms, with Mary T. Maine in the now considerable educational enterprise, the Brantwood School in Bronxville. Each of these women is a person now well along in years. Until 1928 the relations of Miss Smith and Miss Mary T. Maine were cordial, but then became and have since continued somewhat strained by reason of Miss Smith's claim of a partnership with Miss Mary T. Maine, asserted in the *Smith* action and before the same was instituted. The marked success of the school and its growth, as well as the large increase in its assets, are attributable to the industry, ability and high character of these two women, now in litigation over the real character in law of their long-continued business relations, from the inception of their (at least) co-operation so many years ago — Miss Smith asserting that they were partners equally interested in the business, and Miss Mary T. Maine resisting that claim and denying that there ever was a partnership.

I will now define the issues in the *Smith* action only, and will specify the one *now*, by consent of counsel, to be determined:

In the second amended complaint, replete with evidentiary allegations, Miss Smith in effect alleges an oral agreement of partnership at will with Mary T. Maine made " sometime between the 1st of January, 1908, and the 1st of June, 1910," relating to the conduct of the Brantwood School, and specifying each partner's functions therein; which partnership is alleged to be extant.

In an alternative cause of action interposed at the suggestion of the late learned official referee, and perhaps reflecting his inchoate opinion, Miss Smith pleads her employment by Miss Maine between January, 1908, and February 15, 1928, in various capacities at the school, Miss Smith's performance of those services for that period, the receipt of some money and compensation in other forms by Miss Smith, and the value of such services alleged to be $76,400, no part of which has been paid except as represented by such credits.

Miss Smith asks that an accounting of the partnership affairs be adjudged upon the first cause of action; or — and this embraces the possibility of her failure to establish a partnership—that she have judgment against Miss Mary T. Maine upon the alternative (second) cause of action, for $76,400, less appropriate credits.

In Mary T. Maine's answer in effect she (1) denies any partnership; alleges (2) laches and unreasonable delay on Miss Smith's part in asserting a claim of partnership to Miss Maine's prejudice by reason of the death of witnesses, failure of memory and disappearance of material evidence in Miss Maine's favor, as well as her personal assumption of risks, and by reason of her dealings with Miss Smith in reliance upon the latter's acquiescence — all of which is claimed to make it inequitable for Miss Smith to assert thus belatedly her claim of partnership; alleges (3) an agreement for Miss Smith's services for her living and other comforts to be provided by Miss Maine, the value of such provision being in excess of that of the services; alleges (4) a counterclaim relating to a lot near the then school buildings, for which, in February, 1915, Mary T. Maine held a contract to purchase, intending to use it ultimately for school purposes; Miss Maine alleges that she was then indebted to Miss Smith for an overdue loan of $2,000, and that the latter was demanding security for it; also that Miss Maine offered to complete payment of the contract price of the lot, worth $2,800, and cause the same to be conveyed to Miss Smith in satisfaction of the latter's claim and on the understanding that Miss Smith's use of the lot would be such as to benefit and not to injure the school, and that Miss Smith accepted title to the lot, declaring that she had taken it as security, and that Miss Maine, in reliance thereon, thereafter paid taxes on the parcel and expended sums of money toward its improvement for use in conjunction with the school, which expenditures have included a part of the cost of a garage thereon and all of the cost of a certain extension of the chapel building over a portion of the parcel — all with the knowledge of Miss Smith, who, Miss Maine alleges, after the commencement of the *Smith* action, in violation of the understanding, conveyed the lot to David Allen Smith, her nephew, without consideration,

but with the understanding that he should hold it for Miss Smith; Miss Maine also alleges that Frances D. Smith, the wife of David Allen Smith, may claim a dower right in that property, that said David Allen Smith has offered the lot for sale and has demanded the removal of the said portion of the chapel building; and finally that Miss Maine is willing to pay for a conveyance of that parcel the amount of its reasonable value, subject to certain adjustments.

Answering the alternative cause of action Miss Maine alleges (5) a partial defense of the six years' Statute of Limitations.

As indicated, the only issues before me for disposition in the *Smith* action at present are those related to the said first cause of action (alleged partnership). All other issues in the *Smith* action are reserved for future determination to the extent necessary.

I will now discuss the relevant law of partnership:

(1) The burden of proving the pleaded agreement of partnership (oral and at will) is upon Miss Smith; if the evidence, quality considered, is evenly balanced on that issue, a finding of partnership cannot be made. (2) A partnership may only arise *by mutual agreement* between two or more persons; it exists as to its members where they have agreed to combine their labor, property and skill, or some of them, for the purpose of engaging in any lawful trade or business and share the profits and losses as such between them. (Partnership Law, § 2, in effect February 17, 1909; Kent Comm. Lecture 43 [1], relating to the nature, creation and extent of partnerships.) (3) If there is no contract *to be partners* there is no partnership (*Gordon* v. *Farrell*, 157 App. Div. 409, 410), for such an agreement is the foundation of partnership. (*Smith* v. *Dunn*, 44 Misc. 288, 290, 294, 295.) (See, also, *Heye* v. *Tilford*, 2 App. Div. 346, 349, 350; affd., 154 N. Y. 757.) (4) Loose and indefinite talk cannot be made the basis of a finding of a partnership agreement. (*Wilcox* v. *Williams*, 19 App. Div. 438, 439, 440.) (5) Such a contract " must be established to the entire satisfaction of a court of equity before its intervention can be demanded." (Quoted from *Farley* v. *Hill*, 150 U. S. 572, in *Gordon* v. *Farrell, supra*.) (6) Where the testimony claimed to establish a partnership agreement is lacking in probity and weight and the circumstances are clearly against the probability of its existence, the court's credulity would be too greatly strained by a finding that such agreement was made. (See *Summa* v. *Masterson*, 215 App. Div. 159, 161, 162.) (7) A " joint undertaking to share in the profit and loss " must be established (*Pattison* v. *Blanchard*, 5 N. Y. 186, 189); and an " indispensable essential " is " a mutual promise or undertaking of the parties to share in the profits * * * and submit to the burden of making good the losses." (*Reynolds* v. *Searle;*

186 App. Div. 202; read also *Cole* v. *Rome Savings Bank*, 96 Misc. 188; *Stoller* v. *Franken*, 171 App. Div. 327; *Chappell* v. *Chappell*, 125 id. 127; affd., 193 N. Y. 653; *Bogardus* v. *Reed*, 160 App. Div. 294; *Thomas* v. *Springer*, 134 id. 640.) (8) A proprietary interest in the business is also necessary or there is no partnership. (*Heck* v. *Voelkle*, 95 Misc. 692.) Relevant citations might be extended; but the foregoing are sufficient.

I determine as a fact that there never was and is not now a partnership between Katharine E. Smith and Mary T. Maine, as alleged in said first cause of action; and that said cause must be and is dismissed upon the merits.

Because of the industry, earnestness and learning displayed by the lawyers in connection with the prosecution and defense of Miss Smith's claim of partnership, I will extend in some degree my reference to the facts undisputed and established by the greater weight of the credible evidence leading me to the conclusion stated; and will comment thereon. The finding so made in no respect reflects upon Miss Smith who rendered in connection with the Brantwood School for more than twenty years, in whatever capacity and on whatever terms, loyal, unselfish and self-sacrificing service which to my mind is beyond all praise; but she never was a partner and has no rights as such. Whatever, if any, she may have by reason of the proofs adduced or to be adduced in support of her alternative cause of action based upon claimed employment, are not determined at present.

The school in question was established by the Misses Dora T. Maine and Mary T. Maine in South Orange in 1904. They were equal partners in the enterprise in which they invested capital to the extent of about $8,000. They removed the school as a going concern to Bronxville in 1906, where it was established as the Brantwood School or Brantwood Hall School in a house leased by them, known as the Midland House, in which the school was conducted. In 1906 and 1907 these sisters increased their investment by about $2,000. Miss Dora was in poor health and left the school and the State about July, 1907. She returned there, at least as a casual visitor, upon infrequent occasions thereafter, but never did she return to the major activities involved in its conduct in which for all the intervening years Miss Mary T. Maine, assisted (in whatever capacity) from 1908 by Miss Smith, has been active and dominant.

Miss Smith, born in 1861, had been engaged before 1909 in various activities, completing her art studies in 1889, thereafter teaching art in Columbus, Ohio, and still later in a studio in Mount Vernon, N. Y. She entered social work and studied this subject

here and in England, pursuing it later in Cleveland from 1901 to 1903, and then abandoned it, returning to Bronxville, her home. Her personal means were meagre. She was in receipt of a small income from a trust fund from which, in a certain contingency, she had the right to draw sums from the principal. She remained in Bronxville from 1903 until 1908, occupying in conjunction with her friend, Miss Wallace, during that period, three houses, the last being the Masterton house, in which she (or they) took boarders. The Masterton house was near the Brantwood school. Miss Smith made little, if any, money in these enterprises and was compelled to draw upon the small principal, so that in 1908 the trust fund amounted to only $4,000, and conditions were such that further inroads upon it were threatened. Miss Smith made the acquaintance of Miss Mary T. Maine in 1906 at Bronxville, and their relations as friends continued for the many years above indicated. In September, 1907, Miss Maine for a few days boarded with Miss Smith at the Masterton house. In January, 1908, Miss Smith came to Brantwood as Miss Maine's boarder, paying six dollars a week until about April, 1908; in the meantime helping voluntarily and without compensation in the work of the school. Then her status as a mere boarder ceased. Thereafter and until the present time she has lived at or near the school, until this action was commenced, actively engaged with Miss Maine at all times in the conduct of it, except for a few months before February, 1909, but always subordinate to Miss Maine, dominant in its management. Her status, whatever it has been, since April, 1908, continued until the commencement of the action, subsequent to which her activities at the school have been somewhat curtailed by reason of the situation.

I will discuss now some (but, in the interest of brevity, not all) of the evidentiary features claimed to establish the fact of partnership.

(1) *The claimed oral agreement therefor.* Miss Smith, in 1927, while Mr. Rumsey was her attorney, apparently fixed the time of the claimed oral agreement as being in 1906. Mr. Rumsey drew a complaint so alleging. Under the auspices of her present attorney, however, she, in the first complaint in the *Smith* action, fixed that time as being about November, 1906, and later amended that date to November, 1907. In her second amended complaint she states the time as being between January 1, 1908, and June 1, 1910. Before the official referee she testified that it was made about six weeks after January 1, 1908. The second amended complaint in connection with her bill of particulars suggests that the date of the agreement was August-September, 1909, at which time she

fixed it upon the trial before me. In the claimed relevant conversation, whenever it took place, Miss Maine is said to have intimated to Miss Smith that the latter should stop paying board and asked Miss Smith to become an assistant on a salary. The latter declined to do this, stating: " I will come in here as your associate with no salary and we will work this thing up together." Miss Maine thereupon stated (according to Miss Smith) *inter alia*, " * * * we will share everything." I think it is at least debatable whether the testimony as to this oral contract would be sufficient to establish a contract of partnership; but at all events its probative force was so greatly weakened by cross-examination and by Miss Smith's repeated shifting of the date of it and by other facts in the case which negative the making of any such agreement, as to make such testimony of very little use as a basis for a finding that a partnership agreement was entered into. The making of any such agreement was denied by Mary T. Maine.

(2) *The contract for the erection of the gymnasium signed jointly by Miss Smith and Miss Maine, and the bond likewise signed accompanying the $8,000 mortgage (signed by Mary T. Maine only) covering that lot.* The title was taken in the name of Miss Maine; but the contract with the Milligan Company for the gymnasium improvement was signed by both. This contract was prepared by the Milligan Company after its president's oral negotiation with both women, from which he, undoubtedly, concluded that both were interested and prepared the contract with both. This contract was signed after title had been taken by Miss Maine. The bond upon the subsequent mortgage loan of $8,000 was signed by both; but the mortgage by Miss Maine only, because the title was in her name. These transactions, taken by themselves and without reference to other evidence, tend to support Miss Smith's claim of partnership. They are far from conclusive, however.

(3) *Dealings of Miss Smith and Miss Maine with third parties.* Various persons, including Burtnett, Ford, Moebus and Ringrose, dealt with both women in business matters, consulted both, took directions sometimes from one and sometimes from both in relation to school affairs involved in property and building transactions; and noted that they acted in a manner consistent with a joint enterprise conducted by them. This conduct, however, in my opinion was consistent also with the relation of employer and trusted employee.

(4) *Signature card of Bank " Brantwood Hall Mary T. Maine Katharine E. Smith."* This card was dated April 9, 1923, and standing alone has some tendency to support the claim of Miss Smith of partnership at that time existing. Their business rela-

tions, however, commenced fifteen years before that date, and during that period the school bank accounts, with one exception, were always under the control of Miss Maine. Miss Smith signed no checks on the school funds except upon one bank account (see *infra*) for the period commencing September 18, 1918. She appears to have signed some checks; but the great majority of the checks even on this account were signed by Miss Maine (see relevant further discussion *infra*); and all checks on other school bank accounts were always signed by Miss Maine. I decide that Miss Smith's signature was arranged simply as a matter of convenience, not because she was a partner.

(5) *Filing about June, 1923, of a certificate dated June 7, 1923, of assumed business name, signed by Miss Smith and Miss Maine.* This certificate was drawn by Mr. Rumsey, who then was their lawyer. It certifies in effect that they were conducting and after the date of the certificate intended to conduct the school under the name of the Brantwood Hall School, and that they were the persons conducting it. Undoubtedly standing alone this certificate would be strongly indicative of the partnership, although there is no express statement to that effect therein. On the other hand, the certificate states that they were " conducting " and " intended to conduct " the school — a statement consistent both with the relation of partnership and the relation of employment where the employee was as active in the school as was Miss Smith. In addition, in view of all the circumstances, I accept the statement of Mary T. Maine in effect that this certificate was filed as the result of some " legal " advice received by her from a non-lawyer, relative to the continued exclusive use of the name Brantwood Hall School.

(6) *Use of the word " associate," meaning Miss Smith, in certain school literature; and of the words " we " and " us " by Miss Maine and Miss Smith.* The word " associate," undoubtedly, has among its meanings that of " partner; " but manifestly it does not indicate a partnership conclusively; for a mere employee may well be an " associate " of his employer. This frequently happens in law offices. Nor is it at all significant in a conclusive way that these women used the words " we " and " us." They were used in an editorial sense and are not indicative in any conclusive way either of partnership or employment.

(7) *Claimed oral admissions by Miss Maine that Miss Smith was her partner.* No finding of partnership can be made upon these. The courts have frequently stated that such claimed admissions as appear in this record are insufficient as a basis of findings.

The features of the evidence above adverted to, with other features not discussed, might perhaps be sufficient to establish a

partnership if no defense ·were presented. Not so, however, in view of the defendant Mary T. Maine's denials under oath and certain other features of the evidence in her favor, which turn the judicial scale with which I have weighed the evidence, to the side of Mary T. Maine. To some of these features (but not all) I will now call attention.

(a) *There is no written agreement of partnership.* This is, of course, not conclusive, but is an element to be taken into serious consideration in determining where the truth of the controversy is.

(b) *The words " partnership " or " partner " in Miss Smith's version of the claimed oral agreement are not present.* This circumstance, likewise, is not conclusive, but it may well be asked why, if these women intended to form a partnership, this familiar term appears to have been avoided in their conversation.

(c) *Miss Smith's changing, on several occasions during the progress of the case, her statement as to the time when the oral agreement of partnership was made.* These changes I realize might be accounted for by the great lapse of time and by the refreshment of Miss Smith's recollection from time to time as facts were called to her attention. Nevertheless, they militate in an adverse way against the weight of her testimony upon a vital issue; and in view of the defendant's denials and other evidence favorable to the latter, these changes have helped to lead me to the conclusion of no partnership.

(d) *Features related to the first year of the alleged partnership — 1909–1910 — which negative the notion that a partnership had been formed.* The official leaflet for this year gives no intimation of the partnership; Miss Smith is designated therein as " assistant instructor." Concededly, further, in that year she performed the same work as before the claimed agreement was made; and during that period also it is quite significant that Miss Smith designed new stationery for the " Principal's [not Principals'] Office; " nor did her name appear in the advertising of the school, then in the names of " the Misses Maine," " Brantwood Hall " or " Mary T. Maine." In addition, during this same period Miss Smith received what were clearly loans from the school funds in small amounts, the highest forty dollars, which were not charged to her as a partner on account of drawings and which were repaid by her as a debt in August, 1910. In this same first year, also, Mary T. Maine purchased the gymnasium lot with the knowledge, acquiescence and advice of Miss Smith, taking the title in her own name and financed it exclusively with the school, which I find to be (as to Miss Smith) her own, funds. Even the contract of purchase was in Miss Maine's name. These features related to said first year aid in the inference that there was no partnership.

(e) *There was no contribution of capital by Miss Smith to the alleged partnership, directly or indirectly.* The original contributions for this purpose were made when the school was in South Orange and in the first two years of its operation in Bronxville, and were made by Dora T. Maine and Mary T. Maine. They aggregate about $10,000. Additional contributions by Mary T. Maine alone from the proceeds of her life insurance of $4,900 in 1921, and from a loan on her unsecured note in 1926 (loan $15,000 less payments subsequently made on same from school funds, $7,000 — net contributions, $8,000), were made. The non-participation in any way by Miss Smith in these contributions is strongly indicative of no partnership.

(f) *Loans of personal property and of money by Miss Smith to Miss Maine, most of them during the existence of the claimed partnership, negative the notion of partnership.* In 1908 Miss Smith *loaned* her mother's furniture which came to her under the latter's will. In 1911 Miss Smith received a legacy of $2,000 from another source and *loaned* it to Miss Maine. This was not a contribution to any partnership. It was at first without security. Miss Smith was disturbed about that circumstance later and arranged to have the loan repaid by Miss Maine's causing the conveyance to Miss Smith of the lot referred to in the counterclaim in the *Smith* action. In 1915, and subsequently, Miss Smith in effect allowed the use of that lot, then in her name, for school purposes. In 1920 Miss Smith loaned to Miss Maine $3,000 and received as informal security therefor the physical possession of a deed, in Miss Maine's name, of the so-called " Upper lot "— used as part of the school property — and a memorandum signed by Miss Maine that the deed was such security. In 1922 certain furniture and equipment purchased by Miss Smith was *loaned* for use in the school. In 1923 (April) she *loaned* an additional sum of $1,000 to Miss Maine; for this amount plus the above $3,000, loan of 1920, Miss Smith (in 1922) took a $4,000 second mortgage from Mary T. Maine upon another parcel of property used in connection with the school. The form of this mortgage, which was a second lien, suggests that trust funds were loaned by Miss Smith, but that circumstance is of no moment in this case; and the loan was repaid. These various loans, of course, do not conclusively show that there was no partnership, but considered with all the other evidence they aid in the inference that there was none.

(g) *Titles to real estate were acquired for school uses during the term of the alleged partnership and were all taken in the name of Mary T. Maine, with the knowledge and acquiescence of Miss Smith.* The several purchases were made between 1910 and 1926. They

involve a total of $180,000. Thirty-five thousand dollars was paid in cash in the aggregate from school funds. Each deed was to Mary T. Maine only. She alone signed each purchase-money bond and mortgage. Miss Smith was consulted about the advisability of each purchase. Some purchases she approved; others she disapproved; but regardless of her approval or disapproval Miss Maine decided to and did take title to each and all of the parcels, financing them in part with her own credit and paying the cash from the school funds or from moneys raised by her personally. Each deed was indorsed by Miss Smith in a memorandum indicating the property conveyed; all were placed by her in a tin box, so that she could get them conveniently for Miss Maine upon any request of the latter; and Miss Smith actually, as to some of these deeds, took them to White Plains for record.

The consistent acquisition of these titles for school purposes by Mary T. Maine individually militates strongly against the claim that they were (as to Miss Smith) partnership transactions. The latter's statement in her letter dated June 15, 1914, to attorney Ford, in relation to a disputed boundary line of one of the parcels, is very significant in favor of the defendant: " *Miss Maine* [italics mine] is willing to buy this 7' 6" at the original price."

(h) *Titles to bank accounts in which school receipts were deposited during the term of the alleged partnership were (in the main) subject to check only by Miss Maine, to the knowledge of Miss Smith and without the latter's objection.* Until 1918 there was a Brantwood Hall account (Mary T. Maine) in the Gramatan Bank, and from November 23, 1909, to a date of one of the hearings, Mary T. Maine had an interest account therein; she also had in the same bank a Brantwood Hall real estate account from 1916 to a date of one of the hearings devoted to funds for building; and from 1925 to a date of one of the hearings had a Brantwood Hall checking account in the Bronxville Trust Company. Said four accounts were subject to Mary T. Maine's check and control only, with the exception below noted. Miss Smith, from 1908 to 1923, had a checking account in the Lincoln National Bank, and from 1923 to a date of one of the hearings, a checking account in the Gramatan Bank; she also had a savings account in the same bank from 1908 to 1916, and another therein from 1919 to a date of one of the hearings.

When Miss Smith received moneys from school funds her checks repaying them were drawn to Mary T. Maine. It is a fact, however, that from September, 1918, Miss Smith was given authority by Miss Maine to sign checks on the Gramatan Bank — she never had such authority with relation to any other accounts — but this I find was merely for convenience and indeed the bulk of the checks

issued on that account even thereafter contained the signature of Miss Maine.

(i) *Mary T. Maine, with the knowledge and acquiescence of Miss Smith, conducted the school during the term of the alleged partnership (until 1928) as if she were sole proprietor.* In Miss Maine's name were all real estate negotiations, contracts and leases; and as indicated, titles to real estate were taken in her name; so were contracts for reroofing and for major repairs, in other administrative matters, and with teachers. Miss Smith did produce certain estimates in 1927 (after she consulted a lawyer as to her rights) running to herself. These related to the heating plant of the Tanglewylde House. They are not significant for she was then living in that house. There is ample oral evidence too that in the main contracts with the school were made by Miss Maine and not by Miss Smith. Large numbers of bills for school purchases and for services rendered to the school were in the name of Miss Maine, Mary T. Maine, or Brantwood Hall, Mary T. Maine, principal. There were, indeed, a few bills in which Miss Smith figured, but not enough to controvert the suggestion that Mary T. Maine was at all times ".the boss." Diplomas show Miss Maine's name alone; so does the application for registration of the school (Education Law, § 57); the certificate of admission thereon grants the application of *" the principal "* (italics mine); the same applies to school reports to the University of the State and the annual handbook of that body in which Miss Maine is designated as the principal and presiding officer of the board. The school leaflet (1909–1910) gives " The Misses Maine, Principals; " later catalogues, directories, advertising, financial reports to Albany, State handbooks and reports on Regents' examinations, uniformly refer to Mary T. Maine as principal, sometimes as principal and head, or head of school, or president, or presiding officer of the board. In some of these documents Miss Smith's name is not mentioned, in some she is designated as assistant or assistant instructor, in others as deputy and in still others as teacher. In two financial reports to Albany (1923 and 1924) she is referred to in a way as principal, her name being joined in brackets with that of Miss Maine; as to these, however, the physical features of the original reports at Albany compared with those of the copies thereof at Bronxville and relevant evidence in relation to the same, destroy any weight that this item of evidence has as indicating partnership.

(j) *The sharing of income is an ordinary characteristic of partnership; as between these parties there was no sharing for more than twenty years.* There was never any distribution to Miss Smith and Miss Maine upon any ratable basis; if there had been it would

or might have indicated a partnership. I have not overlooked the circumstance that it would be possible to allow all earnings to remain undrawn in the business. There is no evidence from which such an arrangement can be inferred in this case.

(k) *The alleged partners did not share in the management of the school as partners might be expected to do.* Miss Maine, by consent of both, was paramount, and, with like acquiescence, Miss Smith was her subordinate. Her position was inconsistent with the notion of equal partnership. Of course, it is conceivable that in the case of two partners such a situation might exist; but my observation of Miss Smith and the evidence in the case convinced me that she was a person of determination, with ideas of her own which she did not hesitate to express to Miss Maine, and that her subordinate position at Brantwood, as shown in the evidence, reflects the fact that she was not a partner.

The record in this case is so voluminous that the discussion of additional features of the evidence might be prolonged almost indefinitely. The foregoing considerations and others which might be discussed with the evidence as a basis, lead me to the following conclusions:

1. That Miss Smith has failed to establish her first cause of action (alleged partner) by the fair preponderance of the credible evidence; and, indeed,

2. That the overwhelming weight of the evidence demonstrates that there never was a partnership between her and Miss Maine; and

3. That the defendant Mary T. Maine in the *Smith* action is entitled to judgment dismissing, upon the merits, the first cause of action in the second amended complaint therein.

In closing this phase of the consolidated action, I state again that my findings involve no reflection upon the character and integrity of Miss Smith, whose business relations with Miss Maine were as informal as her devotion to Miss Maine's interests and those of the school was marked, loyal and commendable. If, exclusive of her claim of partnership now decided adversely to her, Miss Smith has a valid claim for compensation for services, in excess of any compensation received by her, the second (alternative) cause of action, not yet tried, provides the proper vehicle for appropriate recovery. I make no intimation as to whether she has a valid alternative cause of action or not. Still further, I state that, in my opinion, Miss Smith was fully warranted, by reason of certain evidentiary features, notably the Milligan contract and the transactions connected with the same, and the certificate of doing business signed by both parties, in submitting to the court her alleged rights as a partner; the same observation applies with

equal force to the prosecution of her said claimed rights by her learned and zealous counsel.

The first cause of action of the second amended complaint in the *Smith* action is dismissed upon the merits; any award of costs will await the final determination of the consolidated action, unless there shall be ordered a severance of said first cause of action from the consolidated action; as to the remaining issues to be tried in the *Smith* action, I set the same for trial before me in the Trial Term, Part II room, at White Plains, on the 5th day of October, 1932; as to the alternative cause of action, if either party desires a jury trial, the issues thereto related will be tried before a jury, otherwise before myself without a jury.

I expect to dispose of the issues in the *Maine* action in the near future, in a memorandum — Part 2 thereof.

TAYLOR, J.   In Part 1 of this memorandum, dated July 30, 1932, I determined the issue of alleged partnership in the *Smith* action. In this (Part 2) I decide the issues related to the *Maine* action (second above entitled), brought by Dora T. Maine to obtain an accounting of the partnership concededly formed between herself and the defendant in 1904, for the conduct of Brantwood Hall School, then in South Orange, N. J., and there remaining until 1906, when as a going enterprise it was. removed to Bronxville, where, under whatever auspices, it has been functioning ever since, and has grown in assets and in standing as a school.   No *formal* dissolution of said partnership has been had.   It is alleged by plaintiff, but denied by defendant, that the same still exists, that a dissolution thereof should be decreed and that an accounting should be directed of the partnership transactions from 1904 until now.

I will define the issues in the *Maine* action.

The complaint alleges a partnership at will so formed and for such purpose in the year 1904, to which partnership the parties contributed capital and effort, which school, in 1906, was removed to Bronxville where it functioned thereafter as Brantwood Hall School; that still later, with partnership funds, Mary T. Maine purchased eight parcels of real estate, used as they were purchased, and which are still used, for school purposes; that she took the titles in her name; that such real estate is partnership property; that in December, *1928*, Mary denied Dora's right in the property, upon demand refusing to account for the partnership affairs to Dora and appropriating more than her share after payment of the charges against the partnership property, rendering no account upon Dora's request; that Dora has fully performed all the terms of the partnership contract on her part to be performed and lacks

an adequate remedy at law. She asks in effect that the real estate be adjudged to be partnership property, for an accounting, and incidental relief. The answer admits the fact of the original partnership at will, and substantially as alleged; and further admits the contribution to capital and otherwise, as well as the said removal of the school; but in effect therein the defendant denies that the real estate was used in furtherance of any partnership enterprise, or that it is partnership property or that any partnership *exists* or that the same existed when the *Maine* action was commenced. By way of first defense in effect the defendant alleges that for more than twenty years the plaintiff, disregarding her duty to reside at the school and devote her time, effort and services there in co-operation with the defendant, has done none of these things during that period, has resided continuously away from the school and out of the State, and has abandoned the school following inconsistently other pursuits, while the defendant has devoted *her* time exclusively thereto, investing her personal funds therein, risking her individual credit and treating the school as her individual enterprise, all with the plaintiff's acquiescence for that period during which the latter has unreasonably delayed the assertion of her present claim, to Mary's prejudice because of the deaths of witnesses, failure of memories and loss or destruction of evidence. The defendant claims in effect that an estoppel exists against the plaintiff preventing the latter's assertion now of the alleged extant partnership; also pleaded are the six-year and the ten-year Statutes of Limitations and the existence in plaintiff's favor of an adequate remedy at law. Therefore, (1) there is no issue as to the existence of a partnership formed in 1904, and its continuance at least for a time; but (2) there *is* one as to the existence of the partnership in December, 1928, when the relevant action was established; and (3) laches of the plaintiff is claimed and as well (4) estoppel and (5) the Statute of Limitations. I decide now that in any aspect of the case the plaintiff has no adequate remedy at law.

Certain relevant principles of law will now be discussed and some comment thereon made.

*Partnership; dissolution.* This partnership was at will; therefore, dissolution thereof *may* be inferred from circumstances, but when not the result of mutual agreement there *must* be (a) notice by the party desiring a dissolution to the other, or the former's election to terminate the partnership, or (b) her said election *must* be manifested by unequivocal acts or circumstances brought to the knowledge of the other party, which signify the exercise of the will of the former that the partnership be dissolved. (*Spears* v. *Willis*, 151 N. Y. 443, 449; read *Hutchinson* v. *Sperry*, 158 App. Div.

704, and see *Gilmore* v. *Ham*, 142 N. Y. 1, 4; *Bayer* v. *Bayer*, 215 App. Div. 454, and Partnership Law, § 60.) Mere retirement by one partner from active participation in the partnership affairs is not *per se* evidence of her abandonment of it working a dissolution thereof. (*Spears* v. *Willis, supra; Hutchinson* v. *Sperry, supra.*) In the instant case there was (1) no express agreement of dissolution and (2) no such formal notice of election to terminate the partnership; therefore (3), if there was in law a dissolution at any time after 1904, it will of necessity be by reason of circumstances which at law accomplished dissolution. Further, under general principles relating to contracts, where one partner violates the contract or omits in a substantial, as distinguished from a trivial, way to perform her duties thereunder, she cannot in that situation enforce the partnership agreement (*Schnitzer* v. *Josephthal,* 122 Misc. 15; affd., 208 App. Div. 769; *Denver* v. *Roane,* 99 U. S. 355; *Miller* v. *Chambers,* 73 Iowa, 236); and if a partner substantially breaches the agreement she cannot recover damages or profits to which she would otherwise be entitled; for she must show substantial performance of the essential conditions of the agreement on her part. (*Schnitzer* v. *Josephthal, supra.*) " A partner who has not fully and fairly performed the partnership agreement on his part has no standing in a court of equity to enforce any rights under the agreement." (GRAY, J., in *Karrick* v. *Hannaman,* 168 U. S. 328, 335, quoted in *Schnitzer* v. *Josephthal, supra.*) A refusal by a partner to act, and perform functions as such, as distinguished from mere neglect of duty, may be considered a repudiation of the partnership. (*Denver* v. *Roane, supra,* at p. 361, citing *Wilson* v. *Johnstone,* 16 Eq. Cas. Abr. 606.) " A partner, by renouncing a partnership and opposing it, will be considered as having repudiated his contract with his partners, and will become as to them a stranger. He can no longer set up and enforce as against them the contract which he by his acts denies." (Quoted from *Miller* v. *Chambers, supra.*) No citation of authority is necessary to show that if there is substantial performance of the contract mere absences from the work of the partnership, without the intention on the part of the absentee to abandon it, are entirely consistent with the continuance of the partnership, where there is no express agreement to dissolve it and no notice by either partner of her desire that the partnership at will shall be dissolved. Citation of authority at greater length supporting the principles above stated might be made; but the foregoing will be sufficient.

*Laches; acquiescence; Statute of Limitations.* The *Maine* action was instituted in December, 1928. Defendant asserts and plaintiff denies that the latter in effect repudiated the partnership, deserting the scene of the partnership activities in 1910 at the latest, and

never except as a visitor returning thereto, thereby, according to the defendant, working in law a dissolution as of 1910. The plaintiff's contention in regard to this is in effect that while she was absent from the major activities of the partnership for many years, such absence was with the defendant's consent, that she was in constant touch with the defendant and visited the school at Bronxville upon a number of occasions between 1907 and 1928, taking at least some part in the activities thereof and maintaining, as a matter of law, her status as a partner of the defendant. It is a question of fact for me to determine whether such absences of the plaintiff were consistent with an intention to continue the partnership or to repudiate and desert it. If there was such repudiation and if a dissolution in law was thereby accomplished, as of 1910, it stands undisputed that for at least eighteen years the plaintiff failed to assert her rights by action instituted. *Laches and acquiescence* of a plaintiff will preclude the adjudication of an accounting of the partnership affairs (See *Ray* v. *Bogart*, 2 Johns. Cas. 432; *Hutchinson* v. *Sperry, supra; Farrell* v. *Brady*, 191 App. Div. 333; appeal dismissed, 229 N. Y. 607; *Stout* v. *Seabrook's Executors*, 30 N. J. Eq. 187) where the same have worked to the disadvantage of the defendant. (*Seligson* v. *Weiss*, 222 App. Div. 634, 637, 638, following *Matter of Lord*, 78 N. Y. 109, 111, and 1 Pom. Eq. Rem. § 21.) In each of the cases just cited upon this subject (excluding *Seligson* v. *Weiss* and authorities referred to therein) there was involved delay on the part of the plaintiff for a long period — minimum ten and one-half years, maximum twenty-five years — which characterized the claim belatedly asserted; and in each case, coupled with delay, not excused or excusable, were circumstances which rendered it unjust to award relief to a slothful plaintiff. *Laches* implies such delay and such circumstances. (Lindley Partnership [9th Eng. ed.], p. 570 *et seq.,* and *Seligson* v. *Weiss, supra.*) Although, owing to the good faith in which I am satisfied that the plaintiff is prosecuting this action, that text writer's remarks below quoted are not directly applicable to the present situation, he says significantly: " The doctrine of laches is of great importance where persons have agreed to become partners, and one of them has unfairly left the other to do all the work, and then there being a profit, comes forward and claims a share of it. In such cases as these, the plaintiff's conduct lays him open to the remark that nothing would have been heard of him had the joint adventure ended in loss instead of gain; and a court will not aid those who can be shown to have remained quiet in the hope of being able to evade responsibility in case of loss, but of being

able to claim a share of gain in case of ultimate success." (Lindley Partnership [9th Eng. ed.], p. 572.)

Miss Dora's inactivity for so many years, of course, cannot be justly designated as unfair to Miss Mary, and the former is actuated in no respect by mercenary motives, but only desires to enforce rights which she is advised she has, the action being prosecuted upon the advice of a conscientious, able and zealous lawyer, on behalf of Miss Dora, concededly an original partner in the enterprise, whose substantial contribution to the firm has never been (wholly) withdrawn (read language of KELLY, J., in *Doncourt* v. *Denton*, 55 Misc. 594; affd. on opinion below, 131 App. Div. 905), although the legal status of one portion of that contribution, $800, changed into one of loan upon interest in 1919, and she has been the recipient of certain financial and other benefits from Miss Mary. (See discussion *infra*.) Nevertheless the plaintiff has been absent from the major activities of the school since June, 1907, at which time she was ill, recovering sufficiently to enable her to work in and before 1911. Her absence from the school, except as to visits at infrequent intervals, has continued during the many intervening years. The defendant in those years alone (as to Miss Dora) has conducted the school which has consistently increased in assets and otherwise by reason of Miss Mary's initiative, ability and industry. For the services rendered thus exclusively to the partnership enterprise by Miss Mary, if the partnership is extant, she, under now familiar principles, according to the greater weight of authority, may not be reimbursed beyond her (Miss Mary's) share in the partnership property, because there is inferable from the evidence no agreement, express or implied, for any extra compensation to her. (Partnership Law, § 40, subd. 6; *Evans* v. *Warner*, 20 App. Div. 230; Rowley Partnership, § 356; *Gratwick* v. *Smith*, 202 App. Div. 600, 604, quoting from *Consaul* v. *Cummings*, 222 U. S. 262; *McDermott* v. *Rossney Contracting Corporation*, 131 Misc. 759, 761; modified in 225 App. Div. 784.) If the partnership is or is not extant the circumstance that the defendant could not be lawfully the recipient of extra compensation is of no legal moment. Clearly, if Miss Dora is now to share in the results in a material way achieved at Brantwood to the present time, she will so share with the minimum of effort on her part for more than twenty years. *Statute of Limitations.* If the partnership is extant, the plaintiff's alleged cause of action is not barred; on the other hand, if it was heretofore dissolved in law by reason of the plaintiff's abandonment or repudiation of it by 1910, in such a manner that she became legally a stranger to the partnership, the plaintiff's remedy at law (See *Hulbert* v. *Clark*, 128 N. Y. 295; *Fowler* v. *Wood*, 78 Hun, 304;

affd., 150 N. Y. 584), as distinguished from her *right* as retiring partner to an accounting from her, in that event, liquidating partner, would be gone; for plaintiff's cause of action herein, in that event, would be barred by the ten-year Statute of Limitations (Civ. Prac. Act, § 53; former Code Civ. Proc. § 388), which statute, in that event, would commence to run in this case in favor of the defendant against the plaintiff's claim *after a reasonable time* for the defendant's liquidation of the partnership affairs had elapsed. (*Gilmore* v. *Ham*, 65 Hun, 623; affd., 142 N. Y. 1; also read *Gray* v. *Green*, 125 id. 203, and later report same case, 142 id. 316.) What is a reasonable time is a question of fact.

*Certain other principles of law urged by the plaintiff's learned counsel will be discussed infra.*

Bearing in mind those principles thus far referred to, as well as those so to be discussed *infra*, I have considered the evidence. Therefrom are inferable facts either undisputed or established by the greater weight of the evidence, as follows:

*The original partnership; founding of school, etc.* From 1904 until at least 1910 the parties were equal partners. They contributed in the aggregate jointly about $10,000 to its capital — mostly borrowed money. The plaintiff, the senior of the defendant in age, was the founder of the school. Her reputation as to character, integrity, education and teaching ability was of the best. The same observation applies to the defendant, although her experience because of the fact that she was younger than plaintiff, was then less than that of the plaintiff. The school attracted competent teachers and desirable pupils in South Orange and became established there in a degree. In 1906, however, as previously indicated, it was removed to the growing village of Bronxville selected as a desirable place for it. The school commenced to function there under the same auspices and there, under whatever auspices, it has been since in active operation. In 1906 the Misses Maine became parties to a three-year lease of the original so-called " Big House " (Midland House), then the only school building; and when this lease was renewed in 1909, while it ran to both of them, only Mary signed the renewal.

*Plaintiff becomes inactive.* The tremendous strain of establishing the school told upon the plaintiff. She became ill. In June, 1907, she ceased her activity therein. She never resumed it to the extent to which theretofore she had been active in the conduct of the school.

*Defendant's activities in plaintiff's absence in 1907, 1908 and 1909.* While plaintiff spent the summer of 1907 at her mother's home in North Stonington, Conn., the defendant (alone) was active at the school preparing for its fall opening. It was then opened (fall of

1907) with increased attendance; and under the defendant's active management the school increased in the number of pupils, and actually showed some profit for the year 1907–1908. It expanded in 1908–1909 by leasing a new double house and half of another house (the remaining half being leased by Miss Smith), and at the end of that school year the so-called Mexican Cottage was also leased, and suitably equipped for school purposes; further, the last of certain school bills incurred when both partners were active were paid.

*Plaintiff's presence at times at the school subsequent to June, 1907.* During the two school years (1907 in the fall to 1909 in the summer) plaintiff was in attendance at the school only as follows: (a) At the opening in October, 1907, when she remained a short time and departed; (b) at Thanksgiving time, 1907, remaining only over night and perhaps examining the books; (c) again in March, 1908, remaining a day or two, then thinking that she had recovered sufficiently to resume her work, which resumption, however, was not feasible or consummated, as it was midterm and the plans of the school for that school year had been made. The defendant expressed to plaintiff the former's hope that the latter would return in the fall of 1908; but plaintiff did not return then.

*Plaintiff's continued absence, fall of 1908, and thereafter except upon infrequent occasions.* As indicated, plaintiff did not return in the fall of 1908, and thereafter did not even visit the school for about fourteen years, that is to say until the fall of 1922, except occasionally and casually, (1) for two or three days in *1917*, and (2) for one night in *1921*. Miss Dora's testimony shows that she was practically absent from the school for nine years (1908 to 1917). I quote it: " Q. Now, after 1908, in the spring, when did you next go to Brantwood Hall? A. I think it was in 1917. I couldn't say right off positive, but I think so. Q. About what time of the year? A. In the winter. Q. Was that on your way to East Orange? A. No. Q. Or on your way back? A. No. From East Orange? Q. From East Orange? A. I think so. * * * Q. Now, when you returned to East Orange how long did you stay there then? Did you spend the rest of the winter there then? A. What year are we now working on? Q. 1917. You said. Was it 1917? A. I think so, yes. Q. All right. When did you then go to Brantwood Hall again? A. In 1921. * * * Q. And you stayed how long at Brantwood Hall? A. I think it was in — No, I am right — 1921, I am positive of that. Q. And how long did you stay there then at that time? A. Oh, I think I stayed one night."

In the fall of 1922 Miss Smith, then associated with the school

as an employee (associate principal), was ill and went to the hospital. At this visit of 1922 the plaintiff remained at the school for about a month and I have no doubt that she assisted her sister Mary there during Miss Smith's illness. Plaintiff visited the school in 1923, *according to a witness* who was present only four or five hours and who did not see the plaintiff doing anything. In 1924 she was present at the school for about a month when it was not in session. The marriage of her niece, Elizabeth Whitman, to Mr. Latimer took place during this visit. In the month of June, 1925, the plaintiff visited the school and assisted in proctoring at certain examinations. In 1926 plaintiff was at the school in March and helped to get ready for one of the receptions to parents; in June she assisted in getting a house ready for a summer tenant (Mr. Ashley) and was there on other visits at Thanksgiving time and in December; it is to be observed that she was visiting in Milwaukee between December, 1925, and March 13, 1926. In 1927 she was at the school in her sister's absence on the Christmas vacation, remaining there until about the middle of January, 1927, then going to Charlestown and returning in March or April, 1927, to the school for the period of about a week. In 1928 she was at the school in January, leaving on the first of February to go to Atlantic City, and returning to the school for a time in the last of February or the first of March, 1928. She was also there during the Easter vacation of 1928, leaving thereafter and not returning until July 5, 1928, on which occasion she had a conference with the defendant's lawyer in relation to her appearance as a witness in the *Smith* action, before Official Referee Mills. She testified before him; and was at the school in November, 1928. She had a conference with her sister, the defendant, at Atlantic City on December 24, 1928, after the defendant had received a letter from plaintiff's lawyer intimating plaintiff's claimed rights as a partner. The summons in this (Maine) action was dated and complaint verified December 27, 1928.

On the occasion of the several visits covering a period of many years it is a fact that plaintiff assisted in a degree in the work of the school. There is nothing inconsistent in the fact of such assistance with a status of non-partner. The absence of the plaintiff from the school and its activities was *practically* continuous for twenty years before the commencement of this action in 1928; during which period she practically took no part in the school (except casually, as indicated). Such help as she did render was that which would have been rendered as a relative of the principal and as one who had been active formerly in the school as a teacher

or former partner. In fact, plaintiff speaks of her attendances at the school as " visits."

*Plaintiff demanded no accounting until December, 1928.* It is significant that at no time until then did she demand any accounting of claimed partnership transactions; and in the meantime for years defendant had been conducting the school in a manner violative of the plaintiff's rights as a partner, if plaintiff was a partner.

*Plaintiff's different places of abode, away from Brantwood; her slender means in 1911; her business activities and contemplated activities elsewhere, 1911–1915.* From 1908 to the date of her mother's death in April, 1909, plaintiff lived with various relatives, part of the time at the homestead in North Stonington, then for the summer of 1909 at the Arnold home in Providence, thereafter again at the homestead until October, 1910, when the settlement of her mother's estate, of which she was an executrix, occurred. After the estate was settled her available means in hand amounted to about $800 cash received from the estate. She and the defendant as residuary devisees in the mother's will then owned the fee of the homestead. They were free from the debts of the partnership which were in effect paid when the estate was settled. Plaintiff continued to live at the homestead, drawing on this $800, at times taking a boarder and teaching some children until 1911. She rented the homestead and her available cash at this time was almost nil. She accepted a quasi-teaching position as preceptress or dean in the Wheeler school at North Stonington (not connected with Brantwood Hall) and was in charge of the catering there and of the girls' dormitory upon a modest salary ($30 or $40 a month besides her board) *for about four years, 1911 to 1915.*

*Plaintiff at Lanier School, 1915.* In the latter part of 1915 she was connected with this school, residing there during the absence of the preceptress and looking after the latter's interests. The Lanier School had no connection with Brantwood.

*Plaintiff's plan for the " Hedges," a proposed school.* At some time, not exactly fixed in the evidence, plaintiff concededly planned to open a small school under this title (not to be connected with Brantwood). It was to be opened at the homestead. She advertised in effect that it would be opened. This proposed school never functioned as the enterprise was found by her not to be feasible.

*Plaintiff's life 1915 to 1928, at the homestead and elsewhere.* Between 1915 and 1928, being at Brantwood only upon the infrequent occasions and under the circumstances already indicated, the plaintiff lived at the homestead in North Stonington in the summer time and visited with relatives and friends whose fine

homes were open to her, and where she always met with a warm welcome, from time to time during the other seasons of the year, in various parts of the United States.

*Defendant's activities at Brantwood from 1910 to 1928.* The defendant, during this period, has actually managed and conducted the school; her said sole activity in large measure accounts for its considerable increase in pupils and gross annual income; except in the casual way, above indicated, upon visits, plaintiff has not assisted her. Defendant's conduct was at all times during this period indicative of her claim of sole proprietorship of Brantwood school.

*Defendant's acquisition of real estate 1910 to 1926, in her own name.* During this period purchases of real estate for the school and used by it have been made in the sole name of Mary T. Maine as grantee, in some instances pursuant to contracts signed by her, and in all instances after negotiations with the sellers by Mary T. Maine personally. These purchases involved a cost of somewhat less than $200,000. A substantial amount was paid in cash and the more considerable balance by bonds and first mortgages or subordinate liens executed *only by Mary T. Maine.*

*Defendant's borrowing on her individual notes, known to plaintiff.* During the period of plaintiff's long absence defendant has borrowed large sums on her own notes, for school purposes. At least in a general way the plaintiff has been advised of these obligations incurred by the defendant alone, as well as of the latter's real estate purchases in the name of Mary T. Maine. In all of these trans- actions plaintiff has had absolutely no participation, never becoming a codebtor or copurchaser as far as any record made of the trans- actions is concerned. She knew that the titles were taken by Mary T. Maine in the latter's own name. The plaintiff testified in effect that this was rightly so.

*Plaintiff's acquiescence in various changes at the school violative of her rights, if she was a partner.* It is undisputed that plaintiff acquiesced without protest in (a) the change of the school advertising in 1910, from "the Misses Maine, principals," as it had been formerly, to "Mary T. Maine, principal" (ultimately); (b) plain- tiff's name from 1910 has been consistently omitted from school stationery and forms; (c) all school catalogues commencing with that of 1912–1913, the first issued after the school leaflet ("princi- pals, the Misses Maine") published in 1909, contained the name of only Mary T. Maine as principal; that catalogue (1912–1913) came to the plaintiff's knowledge; that such knowledge resulted in no protest from her is clear, for she produced a copy by her autographed on the fly-leaf; (d) commencing in May, 1910, and

thereafter, the school diplomas which both parties as principals had signed theretofore, bore the signature of Mary T. Maine only as principal; (e) school directories before 1910 showed the names of both as principals; those subsequently issued contained the name of Mary T. Maine only as principal; (f) the lease of the " Big House " (Midland House) in 1906, for three years, expired in 1909; the renewal thereof which was executed in the spring of 1909 and when in effect ran to ·both parties as lessees, *was executed by the defendant Mary T. Maine only;* and subsequently all leases were taken in the name of the defendant only; (g) the registration of Brantwood Hall with the University of the State of New York was made *on defendant's sole application,* and reports to the university make no mention of the plaintiff and were signed only by Mary T. Maine as principal; I note that plaintiff's counsel in his brief admits, and in fact the evidence discloses, the plaintiff upon certain infrequent occasions acted as deputy at examination in a proctoring capacity, although her name as such deputy does not appear in any report; (h) all school bank accounts after August, 1909, were in defendant's sole name and she only signed checks, except that Miss Smith signed checks on one account, subsequent to September, 1918, by Mary T. Maine's authority, the latter having the right to sign on that account also, Miss Smith's signing being always subject to Mary T. Maine's supervision (see part 1 of this memorandum) and applying to a minority of the checks signed on that account only, the bulk of them being signed by Mary T. Maine.

*Defendant's conceded exclusive activities (as to plaintiff) at the school for so many years clothed defendant with at least the appearance of sole proprietorship.* Such activities are at least consistent with sole ownership and control, particularly in view of the attitude of non-protest, acquiescence and consent of the plaintiff, whose rights, *if she were a partner,* were being constantly as well as consistently violated by Mary T. Maine through a long period of years.

*The disputed claim of defendant in effect that plaintiff repudiated and abandoned that partnership not later than 1910; that claim determined.* Plaintiff's long absences from Brantwood, her infrequent visits there, the extent of such visits and what happened upon the same, have already been discussed. Defendant's contention is that such absence, visits and happenings are consistent only with plaintiff's (in effect) intention to have nothing further to do with the partnership or the school, an intention declared by plaintiff verbally (according to the defendant) in two conversations, the happening

of each of which plaintiff, in a non-positive way, denied — one in August, 1909, and the other in the summer of 1910. These conversations are said to have taken place with the defendant and it is claimed by the latter that plaintiff made similar declarations to other persons, some of whom are now dead. The defendant testifies that in August, 1909, she made a " tactful suggestion " to plaintiff that the latter return to the school, and that the plaintiff's response was " Never; " and that in the summer of 1910, discussing Woodside, a new building leased for school purposes and about to be opened, the defendant asked plaintiff if she would come back as head of that school (Woodside) on a salary, but that plaintiff answered " no." There is a quasi issue raised by the evidence as to these alleged refusals involving as they do, particularly in connection with other evidence, repudiation of the partnership by the plaintiff as of 1910, at the latest. I say " quasi " because of the weak character of plaintiff's denials of the defendant's relevant positive statements, which weakness, with the testimony of other persons and the evidence otherwise, including the activities of the plaintiff when recovered in health, in other occupations away from Brantwood for so many years, lead to the conclusion of an abandonment of the partnership and a repudiation thereof by Dora T. Maine consummate in 1910. Her sister-in-law, Clara H. Maine, testified that in or after June, 1907, and in 1908 (referring to the plaintiff): " She stated repeatedly in my house and in that of her sister Mrs. Arnold, that she never could go back to the school and that she never could have anything more to do with it while her sister was there." There is evidence also that other persons now deceased heard these declarations; but their testimony is not available. Miss Smith, whose testimony must be weighed, of course, in the light of her own interest in the Smith action, and of her personal controversy with the defendant, testified that after 1922 plaintiff said to her upon an occasion when Miss Smith was indignant at something that Mary T. Maine had done, " * * * why don't you get out? I did." The plaintiff avoided a direct denial of Clara H. Maine's testimony, stating in effect that she did not think she said that; that she did not remember saying it, that what she did say was not clear in her mind and that she was not prepared to testify on that subject at the time when she was being interrogated. Plaintiff never did testify to exactly what was said at such conversation with Clara H. Maine. In relation to defendant's testimony as to plaintiff's claimed refusal (1909 and 1910) of co-operation in the school, a question of plaintiff's counsel as to her said claimed refusal and the use of the words to her imputed by Mary T. Maine, was answered: " I don't remember that I did;

if I did — " The court intervened with questions but plaintiff gave no positive answer by way of denial. Then her own counsel asked plaintiff whether she said she never would go back to the school. She answered, " I don't think I did; if I had said — ". I have not overlooked the fact that plaintiff testified in an argumentative way that she could not have withdrawn from the school and that what she said to her sister did not mean withdrawal; also that she said that she never intended to abandon the school. Interrogated about the claimed conversation referring to Woodside (1910) with the defendant, plaintiff answered: " It could not have happened. Why should I have a salary in my own school? " Pressed further with the question: " Did it happen? " her reply was " I don't remember it," supplemented with the same suggestion as to the impossibility of a salary. In relation to Miss Smith's relevant testimony, while plaintiff did, indeed, deny that any such conversation occurred, she qualified, and to my mind weakened her denial by stating that it was a " surface conversation " and that " there was nothing at stake," meaning in the conversation, nor have I overlooked the fact that ultimately plaintiff did testify in response to the question, " But did you tell her that you had left the school? " as follows: "A. No, I did not. I never said it to any human being."

Upon all the evidence, after the most careful consideration, I determine as a fact that the equal partnership theretofore existing between the parties to the *Maine* action was dissolved as a matter of law in the year 1910, by the plaintiff by her then and previous repudiation of the partnership which repudiation has continued since that time — until this action was brought.

*The relation to the present controversy of the settlement in October, 1910, of the estate of the mother of the parties.* The effect of plaintiff's claim in relation to this is that it casts an evidentiary shadow forward supporting plaintiff's contention of a continuing partnership in the Brantwood School. The defendant's relevant contention is that it is consistent with plaintiff's repudiation of the partnership and consequent dissolution thereof at a time not later than 1910. Between 1904, when these parties founded the school at South Orange, and the time when plaintiff ceased to be active therein in 1907, at Bronxville, they had made contributions to capital (considered to be equal) in the aggregate sum of $10,000. A portion of this amount ($4,100 and $500) was represented in September, 1926, by their joint obligations to their brother, Herbert E. Maine; some of said amount ($1,000) was represented " in the third year " by a loan to them by a trust company at Westerly; other portions of said amount ($600 and $400) came in the " second

year " as loans of the parties upon their life insurance policies; the further sum of $1,000 came in 1906 from Herbert E. Maine, the trustee of the estate of the father of the parties, and belonged to them ($500 to each); some of the contributions to capital ($1,500 and $1,000) were made by the parties in the " first year," from their respective savings. Such back bills of the school as were incurred while both sisters were active therein were paid by the defendant from school funds or from moneys raised by her alone, before the end of the school year 1909; so that in October, 1910, the parties to this action were liable to third parties only for the borrowings represented in their capital contributions aggregating $10,100. The mother's estate in its non-cash items consisted of real estate appraised at $1,400, devised to Dora T. Maine and Mary T. Maine; of the furniture appraised at $200, and bequeathed jointly to the same parties; the estate held a note of Herbert E. Maine for $4,300 on which $215 interest had accrued, and the amount of said note and said interest in the settlement was credited on the $5,100 note of Dora T. Maine and Mary T. Maine to Herbert E. Maine, and the matter of the indebtedness of Mary and Dora to Herbert and of Herbert to his mother appears to have been thus disposed of and discharged. (Note. The evidence appears to show that of the $5,100 [$4,100 and $1,000] represented in the note to Herbert E. Maine, $1,000 [$500 each] belonged to the parties to the *Maine* action by reason of the provisions of their father's will of which Herbert E. Maine was trustee.) The cash items of the mother's estate consisted of an aggregate (including interest) of $6,049.19 in four banks; her debts, funeral and administration expenses, taxes and repairs and certain household expenses subsequent to her death, and legacies ($3,000) given to other persons, aggregated $4,212.34 and reduced the net cash in the estate to $1,836.85, which was substantially the amount ($1,829.18) shown in the bank balance of Dora T. Maine (estate money) on October 14, 1910. From such bank balance, $1,829.18, there was deductible for estate bills, paid (I think), in the sum of $62.87, which left net cash for distribution to the two sisters the sum of $1,766.31. From this the note of Dora T. Maine and Mary T. Maine at the Industrial Trust Company (Westerly) in the sum of $1,000 (representing an original contribution to Brantwood by these parties) was paid, and $766.31, the then balance, appears to have been treated by Dora T. Maine as her individual money, which she spent as she pleased. In view of the informality of the proceedings which characterized her accounting, the attitude of acquiescence of Mary T. Maine and all the evidence in the case, there can be no reflection upon Dora T. Maine for this disposition of the said ultimate balance. Mani-

festly, it was so expended in her own interest by the consent of Mary T. Maine. I cannot see that the transactions above adverted to in any way support the plaintiff's contention in relation to the issues in this case. The transactions, if they have any bearing, are consistent with the notion that no partnership existed between them in October, 1910.

*The endowment policies of Dora T. Maine; the loans thereon aggregating $800 to her, represented (net) in her contribution to the former capital in 1905; the maturity of those policies (each $2,000) in 1918; transactions then and thereafter in 1919, between the sisters in relation to those matured policies and their payment to the plaintiff, and the subsequent $40 annual payment by defendant to plaintiff, amounting to five per cent on $800.* In 1898 the New York Life Insurance Company. issued said two policies on plaintiff's life. Defendant was the beneficiary named in each. In 1905, $800 ($400 on each) was borrowed on them at five per cent per annum and the net proceeds of the loan were added to the school funds. Each year thereafter until and including 1918, from the school funds was paid $211.60 in premiums on the policies and $40 interest on the loan of $800 (total annual payment, $251.60), except that for two years Herbert E. Maine paid the premiums. Up to the time of the dissolution by operation of law, in 1910 (in effect found *supra*), the premiums paid, $211.60, in the absence of evidence of a different arrangement between the parties, would have been chargeable clearly to the plaintiff on account of her share of the profits (if any), otherwise against her share of the assets in liquidation. Clearly, also, plaintiff benefited in this period (1905 to 1910) to the extent of at least $1,000, for she was not obliged to pay personally the premiums on the policies. The defendant (beneficiary) continued the premium payments from 1910 to 1918. The plaintiff benefited therefrom (eight years at $211.60) about $1,700 more; less the payments by Herbert E. Maine. In 1919, with the consent of the defendant (beneficiary), the plaintiff exercised an option to accept from the insurance company an annuity for life in the sum of $435.20 (less some adjustment by reason of the $800 loan); and as to the said $800 loan then outstanding, the proceeds of which originally, as aforesaid, went to the school funds, both parties in effect agree in their testimony that said sum was left in the school with the understanding that (quoting defendant's words, according to the testimony of the plaintiff): " the school will give you [plaintiff] the interest on it if you will leave it there." To this plaintiff agreed. *The defendant has paid to plaintiff $40 per annum, including 1929.* This is five per cent annually on $800. She sent to plaintiff in 1930 a check for $40, not deposited.

The payment from school funds of plaintiff's annual premiums of $211.60 each from 1910 to 1918, standing alone, might be some basis for an argument that a partnership was extant between the parties during that period. That fact, however, must be considered with all others inferable from the evidence, so many of which other facts have been adverted to. So considered there is nothing in the fact of the payment of said annual premiums from 1910 to 1918, which is inconsistent with the notion that the partnership had been dissolved by plaintiff's repudiation of it; particularly as Miss Mary was the beneficiary; as to the $800, the proceeds of the original loan paid into the school by Dora T. Maine, its legal status as a loan by plaintiff to defendant became fixed as of 1919, when she " left it in the school," thereafter receiving five per cent interest per annum from the defendant upon the same. .

*Reasonable time for liquidation by Mary T. Maine of the partnership between herself and Dora T. Maine, dissolved in 1910.* Considering the character of the school enterprise as it was in 1910. at which time most of its property was personalty and chattels real (leaseholds), only the so-called gymnasium lot being realty, I decide that the two years expiring December 31, 1912, constituted a reasonable time for such liquidation. Therefore, the ten-year Statute of Limitations commenced to run against plaintiff's claim for an accounting on said last-mentioned date (relevant cases, *supra*); hence the plaintiff's said claim was barred on January 1, 1923, on which day the loss of her *remedy*, as distinguished from her *cause of action for an accounting*, was complete.

*Burden of proof.* Considering the issues as tendered by the pleadings, and the fact that the original partnership between Dora T. Maine and Mary T. Maine was conceded, the plaintiff, in order to prove a cause of action, was bound to establish by the fair preponderance of the credible evidence that the partnership formed in 1904 was extant, undissolved, in December, 1928, when the *Maine* action was started. Under familiar principles the partnership formed was presumed to continue. The duty of coming forward with evidence to show a dissolution (as distinguished from the burden of proof) was Mary T. Maine's; but when she presented such evidence, then upon the whole case and throughout the case, the plaintiff bore the burden of proof. I decide that she did not sustain such burden. In my opinion, however, regardless of whether the said burden was upon the plaintiff or upon the defendant, the proofs from which inference of dissolution, at least by 1910, follows, are overwhelming in favor of the defendant Mary T. Maine, and require a finding of dissolution.

*The estoppel claimed by plaintiff to preclude defendant from asserting*

*such dissolution as of 1910, and laches and acquiescence; also a dis-*
*cussion of certain alleged admissions of defendant in the course of this*
*consolidated action.* An interesting discussion of these subjects is
contained in the briefs. Plaintiff claims in effect, and the defendant
denies, that the latter's conduct in defending the *Smith* action
(alleged partnership), her relevant attitude therein as to the partner-
ship existing (at least) at one time between the Misses Maine, and
other facts incidents of such conduct, including her calling of Dora
T. Maine and other persons as witnesses in reference to such partner-
ship as an aid to Miss Mary in defeating Miss Smith's claim, preclude
the defendant from asserting now that the partnership between
these sisters was dissolved by 1910, or that the plaintiff was guilty
of laches and acquiescence, or may take advantage even of the
Statute of Limitations. Whatever was the defendant's said
attitude and conduct it related originally to the defense of Miss
Smith's action only. The relevant law of estoppel and as to
admissions made in the course of a litigation has been carefully
considered in connection with the relevant facts. My conclusion
is that there was no such estoppel so precluding Mary T. Maine.
The following are my reasons for this ruling: (1) Before the
official referee (see part 1 of this memorandum) in the *Smith* action,
the defendant moved in September, 1928, for leave to amend her
answer *in that case*, to allege in effect (a) that for several years
continuously before, and at, the time when Miss Smith alleged
that her partnership with Mary T. Maine was formed, the school
was conducted by the Misses Maine as equal partners; (b) that
*then* all the capital of the enterprise and its good will were owned
jointly by Miss Mary and Miss Dora, the former having no indi-
vidual title thereto or power of disposition thereof except for their
joint interest and benefit; (c) that said capital was necessary in
the conduct of the school and that Dora T. Maine was entitled
to her " share as partner in the earnings from the use of said property
and from the defendant's activities and services in the conduct of
the school;" (d) that Miss Dora did not know of, consent or agree
to any partnership between Mary T. Maine and Katharine E. Smith;
(e) that from the time of said alleged partnership (Smith and Maine)
the partnership agreement between Miss Mary and Miss Dora
" continued and attached to any and all earnings and profits of the
school and to the proceeds thereof; " (f) that such earnings and
profits during the period alleged in the Smith complaint were the
products principally of the use of the capital of the Misses Maine
and of Miss Mary's activities, and that Miss Smith never acquired
any interest therein at law or in equity; and finally (g) that there
was defect of parties defendant in the *Smith* action in that Miss

Dora claimed an interest in the subject-matter thereof by reason of such (above stated) alleged facts and had not been made a party to the action although willing to be.

The proposed pleading was never verified or even signed by Mary T. Maine. There is no evidence that she ever read it or that it contained anything but her lawyer's then conclusions. Leave to serve it was given (upon her counsel's request). *It never was served.* My view is that the facts therein alleged were provable without the amendment. Failure to serve it may reflect that circumstance; and/or reconsideration by her excellent lawyer and defendant of her broad (apparent) admission of *continuing partnership* as of 1928, wholly inconsistent as the same was with the real facts related to Miss Dora's repudiation of the partnership eighteen years before, and her activities — and at times, repose — elsewhere in the meantime. The proposed pleading declared in effect that the partnership *was* extant. This declaration is not at all doubtful; but if there was such admission, it was " not in any sense final or conclusive." (2 Wigm. Ev. § 1059.) It did not preclude Mary T. Maine from denying its correctness and showing the facts thereafter; it was merely an inconsistency having at most the effect of discrediting in some degree her present claim and her other evidence. (Id.) I determine, however, that it constituted not even an admission by her, as she did not verify it or sign it and was not connected with it in the evidence legally. (*Cook* v. *Barr*, 44 N. Y. 156, 158; *McKane* v. *Dady*, 128 App. Div. 190; affd., 201 N. Y. 574.) Further, the admission was not made to Miss Dora; if made it was to Miss Smith in the *Smith* action. These circumstances are quite relevant to the claim of equitable estoppel, the foundation of which is a representation *made to a person sought to be influenced.* There is no doubt as to the, at least, *prima facie* effect of an admission in a pleading, not made upon information and belief. (See *Mittnacht* v. *Bache*, 16 App. Div. 426), signed and verified by the party as in *Taft* v. *Little* (178 N. Y. 127), and in *Donnelly* v. *McArdle* (120 App. Div. 871); for there must be shown signature, direction or sanction *by the party.* (*Eisenlord* v. *Clum*, 126 N. Y. 552, 559; *Cook* v. *Barr*, *supra*.) The same principle applies to an oral statement of counsel upon a judicial inquiry, as to which " there is every reason why * * * *it should not be taken* [italics mine] as a solemn admission of fact whereby the client may not afterward gainsay " it (*Anderson* v. *McAleenan*, 15 Daly, 444, 448); and, as to a formal written pleading, " it must be shown ' by the signature of the party or otherwise that the facts were inserted with his knowledge or under his direction and with his sanction.' " (Id., citing *Cook* v. *Barr*, *supra*.) Pleadings in technical form drawn by lawyers " can hardly be considered

as the act of the parties." (From *Baldwin* v. *Gregg*, 13 Metc. [Mass.] 253, 255.) How deficient as a binding admission by the defendant such a proposed pleading is, where there is "nothing to indicate how far the attorney was instructed by the defendant in this particular," is apparent from the discussion in *Farr* v. *Rouillard* (172 Mass. 303, 305). I have not overlooked the fact that *by general questions* plaintiff's counsel sought to establish that the defendant sanctioned the contents of the proposed pleading nor the other circumstance that such counsel never asked her *directly* whether she *had* so sanctioned them.

Assuming, without conceding, that this proposed pleading contains admissions binding if at all on the defendant, they are effectual for estoppel purposes only in the *Smith* (not in this) action. (Read *Sweet* v. *Tuttle*, 14 N. Y. 465, and other relevant cases; also see *Stemmler* v. *Mayor, etc., of New York*, 179 id. 473, 482; *People ex rel. Rhodes* v. *Mole*, 85 App. Div. 33; *Burke* v. *Ireland*, 47 id. 428; *Oliver* v. *Bennett*, 65 N. Y. 559.) This statement does not conflict with the legal truism that an admission by a party made anywhere and at any time is evidence against her. (*Dusenbury* v. *Dusenbury*, 63 How. Pr. 349; *Reed* v. *McCord*, 160 N. Y. 330, 341.)

In the *Smith* action Miss Mary, the defendant, called Miss Dora as her witness in relation to the partnership between the Misses Maine, and also called other witnesses upon the same subject. Thereby she vouched for their general credibility as to which she could not *impeach* them (*Pastene & Co.* v. *Irving National Bank*, 249 N. Y. 272, 275; *Carlisle* v. *Norris*, 215 id. 400, 409), although she might show that the facts were different from what her witness stated them to be, and might contradict the latter, or even ask the court to pass upon the truth or accuracy of the witness' testimony, if it was inherently improbable, or contradicted (*Carlisle* v. *Norris, supra*, 410); because a trial in the last analysis is a search for the truth. Although defendant did call the plaintiff as a witness in the *Smith* case, defendant is not bound herein by her testimony therein, even if on its face it leads to the inference of continuing partnership as of 1928. As such witness the plaintiff was not defendant's agent authorized to speak for her (See *Aldridge* v. *Ætna Life Ins. Co.*, 204 N. Y. 83); although "if one party refers another * * * to a third person, *as authorized to answer for him* [all italics mine] he is bound by what his referee answers." (Id.)

An estoppel of record such as is claimed here can exist only as between the same parties (Katharine E. Smith and Mary T. Maine) or those in legal privity with them, in the same case on the same issues. (*Sweet* v. *Tuttle*, 14 N. Y. 465, 470, 473; *Brady* v. *Foster*, 72 App. Div. 416, 418; *Brussel* v. *Louvre Hotel Co.*, 88 Misc. 47; 2 Wigm. Ev. § 1065.) Estoppel is "an admission or determination

under circumstances of such solemnity that the law will not allow the fact so admitted or established to be afterwards drawn in question between the same parties or their privies." (*Matter of Mesa y Hernandez,* 172 App. Div. 467; affd., 219 N. Y. 566.)

This case presents as to the proposed pleading, practically the interposition of "an inaccurate statement" by defendant, subsequently in effect corrected by her. (*McAdam's Executors* v. *Hawes,* 72 Ky. 15, 23.)

Careful and protracted consideration convinces me (a) that there was no estoppel of the defendant, of record, and (b) no equitable estoppel of the defendant, for any representations made by her were made to Miss Smith in the latter's action between the consolidation — not to plaintiff in the *Maine* action, who cannot take advantage of them (2 Pom. Eq. Rem. § 805, p. 1644; *Maguire* v. *Selden,* 103 N. Y. 642; *Mechanics' Bank* v. *N. Y. & New Haven R. R. Co.,* 13 id. 599, 638; *Empire Mfg. Co.* v. *Moers,* 27 App. Div. 464, 467), and as plaintiff knew the real facts of her repudiation of the partnership involving (in law) its dissolution, there can be no estoppel in plaintiff's favor. (*Hutchins* v. *Hebbard,* 34 N. Y. 24, 28; *Shapley* v. *Abbott,* 42 id. 443, 448; *Baker* v. *Union Mutual Life Ins. Co.,* 43 id. 283, 289.) Because of such implied knowledge, plaintiff was not, and could not be, deceived to her prejudice; no estoppel exists where there is no reliance upon representations, where such reliance is impossible and where the party was not and could not be thereby misled to her prejudice. (*Winegar* v. *Fowler,* 82 N. Y. 315, 318; *Organ* v. *Stewart,* 60 id. 413, 420; 2 Wigm. Ev. § 1057.) Finally, there was no change of plaintiff's position because of her reliance on any representation made by Miss Mary (if any) that the plaintiff was still Mary's partner; and as to the regrettable accident to Miss Wooster, a student who was killed by being thrown from a horse, the plaintiff's testimony, when she was called by her sister as a witness in the *Smith* case, to the effect that she was her sister's partner, did not in any respect increase or decrease plaintiff's liability (if any) for debts of the enterprise and/or for damages for Miss Wooster's death. If plaintiff was liable in these respects her liability was not created, or affected, by the circumstance that Miss Mary called plaintiff as a witness; plaintiff's position was in no respect changed.

The considerations above discussed and the views above expressed lead to my conclusion now announced that the defendant was not estopped from proving, as she has done, that the partnership was dissolved in 1910.

*Summary of findings and conclusions.* I find (1) that the equal partnership formed in 1904 was in legal effect dissolved not later

than 1910; (2) that a reasonable time for the liquidation of its affairs by Mary T. Maine expired on December 31, 1912; (3) that the *Maine* action was commenced December 27, 1928, or nearly sixteen years after December 31, 1912; (4) that plaintiff's cause of action is barred by the ten-year Statute of Limitations, which lapse of time while not affecting plaintiff's legal right (as such) to an accounting of the partnership affairs, including its good will, as that right existed between December 31, 1912, and December 21, 1922, deprives plaintiff of her remedy by action; (5) that plaintiff's laches and acquiescence is sufficient ground for denying equitable relief to her; (6) that defendant is not estopped from urging the dissolution of the partnership, plaintiff's laches and acquiescence, and the Statute of Limitations; (7) that the complaint in the *Maine* action should be dismissed upon the merits.

*Some additional moral, rather than legal, observations.* While I have no doubt that under all the circumstances the result is in general just to both parties, in view of Miss Dora's long period of failure of co-operation in the school enterprise, brought to fruition by Miss Mary's efforts exclusively, the following facts remain (regardless of the dissolution, laches and acquiescence, and the Statute of Limitations): (1) Miss Dora's contribution to the firm in money, about $5,000, has never been fully repaid to her, at least in money, by Miss Mary, although I think that Miss Dora's benefits from the mother's estate in use of the property and in money were in excess of those received by Miss Mary from the estate. Other benefits to Miss Dora financially are inferable from the money paid by Miss Mary for the life insurance premiums. All of such benefits to Miss Dora constitute at least a moral offset, *pro tanto*, to her financial contribution to the original firm. (2) Miss Mary has had the sole benefit of the good will of the enterprise since 1910, of all profits to that date and since then, and also of Miss Dora's considerable effort in the early years (1904 to 1908) of the school; and benefited by Miss Dora's improvements of the homestead.

It may be that a moral obligation of Miss Mary to Miss Dora exists for any excess of the latter's contributions in money and effort, plus her interest in the good will and in the profits as of 1910, overpayments made in effect for Miss Mary's account to Miss Dora, or for the latter's benefit. The Statute of Limitations only affects plaintiff's remedy and deprives her of it. It never affects or destroys a moral obligation. (See language of KELLY, J., in *Doncourt* v. *Denton*, 55 Misc. 594; affd., 131 App. Div. 905.)

*Costs in the Maine action.* In this case the proper exercise of discretion requires that costs should not be awarded.

The complaint is dismissed upon the merits, without costs.