**In re Paul P. MATIS, Jr., Charlotte A. Matis, Debtors.**

**Bankruptcy No. 86–00478.**

United States Bankruptcy Court, N.D. New York.

May 28, 1987.

See also, Bkrtcy., 73 B.R. 228.

Herzog, Engstrom, Burke, Koplovitz, Cavalier & Lyman, P.C., Albany, N.Y., for Central National Bank, Canajoharie; Charles J. Tallent, Patrick J. MacKrell, of counsel.

Brett W. Martin, Utica, N.Y., for debtors.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The Central National Bank, Canajoharie ("CNB") seeks relief from the automatic stay of § 362 of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code") so as to proceed against certain assets of Paul P. Matis, Jr. and Charlotte A. Matis, husband and wife, ("Debtors"). CNB is Debtors' largest creditor, holding secured and unsecured

claims in a stipulated total amount of $614,-198.48. The parties do not dispute that between September, 1980 and January, 1982, they entered into a series of five (5) secured transactions, and that CNB had properly perfected its interest in the stated collateral by filing financial statements (and continuation statements where appropriate) with the Clerk of Montgomery County, New York. What is disputed is whether CNB has a perfected security interest in some 95 head of registered Holstein cows and heifers, by virtue of "after-acquired property" clauses in the pertinent security agreements. Debtors contend these animals are not part of their bankruptcy estate, but rather are owned by a partnership doing business as Dutch Treat Farms. Debtors allegedly are co-owners of a one-half interest in this partnership, with the other one-half interest owned by C. Philip Armistead ("Armistead"). Concerning this discord, testimony and evidence was had as to the status of ownership, as well as to the herd's value.

The second item of contention involves the valuation of Debtors' farm machinery and equipment for purposes of determining adequate protection. Again, there is no dispute that such collateral is the subject of a CNB security interest.

Testimony and evidence was adduced over the course of two and one-half days (September 18, December 10, and December 11, 1986), with each party afforded the opportunity to cross-examine. The parties were ordered to submit memoranda no later than December 29, 1986; however, as CNB and Debtors agreed amongst themselves to extend this deadline, the Court interprets the former's actions to constitute a waiver of the provisions of Code § 362(e), and Fed.R.Bankr.P. 4001(b).

### FINDINGS OF FACT

The Debtors filed their petition for relief under Chapter 11 of the Code on March 27, 1986. At the time of the filing, and at all material times prior thereto, Debtors were engaged in the dairy farming business, operating at a number of different locations in Montgomery County, New York.

Mr. Matis testified extensively concerning the alleged partnership relationship with Armistead, which began some time in December 1975. Apparently, these individuals agreed to start a business involving the acquisition, maintenance and trading of a registered herd of Holsteins. This business was to form only one part of Debtors' ongoing dairy operations. Armistead agreed to purchase 12 purebred animals, with Mr. Matis providing the daily care of the herd. Later additions were anticipated, with Armistead to supply the purchase money. Armistead stated he last purchased animals for the herd in 1981 or 1982. These later purchases totaled some $54,000.00, and the parties memorialized Debtor's resultant obligation by executing a promissory note listing a total obligation of $104,000.00. This note, executed on May 1, 1979, presumably documents the $54,000.00 in animal purchases, as well as a $50,000.00 loan from Armistead to Debtors. The note describes the collateral securing its repayment as "2d mortgage on real estate conveyed this date and cattle registered to Charles P. Armistead, Paul Matis, Jr. and Charlotte Matis." The note recites that monthly principal and interest payments are to be $800.00.

Mr. Matis and Armistead never executed a formal document detailing their business relationship. Both Armistead and Mr. Matis testified their agreement provided for Armistead's purchase of cattle, and Debtor's feeding and milking of the animals. Debtors were to retain all milk check proceeds. Armistead expected to get "interest" on the money he invested, with any sale proceeds to be split "half and half". Were the herd dispersed, Armistead was to regain his capital investment, and any remaining profit would be evenly split. (Transcript pp. 65–66, 1. 22–8). Both Armistead and Mr. Matis believe that Mrs. Matis, by virtue of marriage, has a one-half interest in her husband's interest in the business. Mrs. Matis apparently runs all milking operations for the herd.

Mrs. Matis testified that after joining the

business,[1] she contacted an attorney for the purpose of preparing a document detailing the ongoing business venture. She purportedly gave the attorney written information concerning the composition of the herd, as well as the parties' ownership interest in certain of the animals therein. The attorney apparently utilized this information to prepare certain documents which were forwarded to, and ignored by, Mr. Matis and Armistead. One year later, Mrs. Matis purportedly had another set of documents prepared; this time she personally delivered copies to her husband, and it is "to this day in his drawer by the bed." (Transcript, p. 201 1.6–7). Although both Debtors were subpoenaed to produce all documents concerning their business relationship with Armistead, the proposed agreement still, presumably, rests in the nightstand.

Neither Mr. Matis nor Armistead recalled Mrs. Matis' efforts concerning the written agreement. In fact, Armistead said he never spoke to Mrs. Matis regarding ownership of the cows, and Mr. Matis never mentioned the unexecuted document when questioned about the existence of partnership documents.

When Mr. Matis and Armistead first began their business relationship, they operated as the "Palatine Stock Farm". Mrs. Matis joined the operations about two or three years prior to her marriage to Mr. Matis, and she suggested the use of the name "Dutch Treat Farm" for the purpose of building name recognition for the herd. This name was registered with the Holstein-Friesian Association of America, located in Brattleboro, Vermont ("Association").

Richard E. Nelson ("Nelson"), the Association's Executive Assistant of Domestic Affairs, testified his organization maintains a registry of animals in the Dutch Treat Farm herd. The Association's records reflect that Mr. Matis and Armistead had registered animals as early as 1976 (Transcript, pp. 136–37, 1.24–7), but that in 1978, both Armistead and the Debtors began registering animals using the Dutch Treat

Farm name. The Association maintains two signature cards for Dutch Treat Farms. The first card was filed with the Association on April 20, 1981 (Ex. D–11, 12/11/86); the second was filed on December 12, 1985 (Ex. D–10, 12/11/86). The Association also maintained signature cards for the Debtors alone, filed December 13, 1978 (Ex. D–11, 12/11/86), as well for Mr. Matis and Armistead together, filed December 6, 1976 (Ex. D–11, 12/11/86). Each card recites that for the Association's purposes, "those whose personal signatures appear [on the cards] constitute the *owners* of all animals recorded in the name of the partnership listed at the top of the card."

The Association is a voluntary organization, organized for the purpose of maintaining records documenting the ownership and transfer of purebred cattle. Consequently, the Association has strict rules for the documentation of the transfer of registered animals by members, with each transaction to be accompanied by a fee payable to the Association. Despite the diligent efforts of Nelson and other Association employees, it is obvious the Association's records, relying as they do on information received from members, are neither accurate nor complete. For example, Mr. Matis testified that of the Association certificates for animals currently in the Dutch Treat Farm herd, at least thirty indicated the owner to be someone other than the alleged partnership, the Debtors, or Armistead. Also, Mrs. Matis testified that certain animals currently a part of the Dutch Treat Farm herd, and registered with the Association under that name, are actually owned by her sons.

Indeed, Nelson stated the Association's certificates do not serve as a warranty that the "owner" listed thereon is correct. The Association's certificates are not certificates of title, nor do they reflect security interests in the subject animal. While the signature cards of the Association utilize terms with legal significance such as "ownership" and "partnership", the organization does not require supporting documentation

---

1. Mr. and Mrs. Matis were married some time in either 1978 or 1979.

of a business entity's legal identity. Nelson stated that if an application is made for partnership membership, the Association requires only the applicant's representation that articles of partnership could be provided. Applicants would not be required to submit such evidence however. If existing Association members desire to register animals utilizing a partnership name, the Association does not require any proof at all, be it formal or informal. Consequently, when Debtors and Armistead signed the signature card for Dutch Treat Farms, they did not provide the Association with proof of partnership operations.

The Debtors contend that when they sold Dutch Treat Farm animals, the proceeds were evenly divided with Armistead. Both Armistead and Mr. Matis recalled only one specific occasion when sale proceeds were divided. The sale took place in October 1980, with net sale proceeds of $3,950.00 being divided. Armistead did not recall ever receiving other sale proceeds, even though he stated that over the life of the alleged business relationship with Debtors, some 50 to 60 cows would have been disposed of. (Transcript, p. 89, 1. 1–14). Without specific reference, Armistead did recall giving some animals to the Debtors so that the sale proceeds thereof could be reinvested.

Armistead recalled another instance where he transferred his interest in a Dutch Treat Farm animal to one of Mrs. Matis' sons; Armistead said he "gave him my half ... and they gave their half." (Transcript, p. 88, 1. 1–6).

For the years 1985 to 1986, the Debtors insured the Dutch Treat Farm animals in their own names as "owners". CNB was listed as the first loss payee, and Armistead as the second. Mr. Matis stated CNB took care of all the insurance, and told him "what they wanted and when they wanted, and how they wanted it written." (Transcript, p. 38, 1. 22–24).

William McLauchlin ("McLauchlin") testified Debtors had maintained property and casualty insurance with his business (Wood Schultz [sic] Agency in Ft. Plain, New York), for a period in excess of ten years.

Mr. Matis had testified that all insurance for all his farming operations was procured through McLauchlin's Agency. Specifically, Debtors had insured real estate, cattle, machinery, and their vehicles with the agency. McLauchlin stated his agency never wrote insurance for a business entity in which both Debtors and Armistead had an interest. Nor did an entity known as Dutch Treat Farm ever purchase insurance coverage through McLauchlin. McLauchlin's agency never sent a bill to Armistead for any insurance coverage.

McLauchlin stated that for Debtors' livestock insurance, only CNB had ever been listed as a loss payee. Armistead was designated a second loss payee, behind CNB, on real estate insurance issued by the agency. At the time of the later dates of the hearing, Debtors had received a cancellation of insurance notice due to nonpayment of premiums.

Armistead testified he owned cows and feed located on a premises known as the Chapman Farm. Armistead stated he leased the animals and feed to Mr. Matis pursuant to a formal, clearly defined lease agreement. The parties' contract provides that Mr. Matis will pay Armistead twenty percent of the herd's milk check. The Chapman Farm animals are insured by Armistead himself with the Mohawk Minden Insurance Group; Armistead is the Treasurer of this organization. At one time cows owned by Debtors were insured with this agency, but such coverage ceased upon decision by the manager of the particular insurance company represented by the agency.

Armistead does not claim either his purported interest in the Dutch Treat Farm cows, or his "partnership" interest with the Debtors, as an asset of his own for purposes of his various business dealings with lending institutions in the area. However, Armistead has, on occasion, claimed the $104,000.00 promissory note executed by Debtors as a "receivable". For purposes of his individual income tax preparation, Armistead claims the $800.00 received each month as interest income. Armistead has never filed state or federal partnership tax

returns for the Dutch Treat Farm operation.

In fact, Debtors have similarly neglected to formally evidence their "partnership" with Armistead. They have never filed a certificate with the appropriate county clerk for the carrying on or conduction of business under the name Dutch Treat Farm, nor has a requisite partnership certificate been filed. *See* N.Y.GEN. BUS.LAW § 130 (McKinney 1968 & Supp. 1987). Debtors also have never filed state or federal partnership tax returns, and have never provided Armistead with either an accounting of the operations of the Dutch Treat Farm herd, or an inventory of the number of animals in the herd. Payments to Armistead have always been in set monthly amounts, bearing no discernable relationship to income from milk sales, sales or deaths of herd animals, growth of the herd through births, or incurrence of related feed bills, veterinary bills, etc. In fact, neither Mr. Matis nor Armistead could recall how they arrived at the present monthly payment figure of $800.00 per month, although smaller, set monthly payments had been made in the past.

Debtors did not attribute any value to their "partnership" interest with Armistead when preparing their bankruptcy petition, schedules and statement of affairs. Additionally, Debtors did not schedule the note indebtedness to Armistead as a debt in their bankruptcy schedules.

Larry Benton ("Benton"), a certified public accountant, acted as Debtors' accountant between 1977 and 1983. He prepared annual financial statements utilizing Debtors' records, with the last statement prepared for the year ending December 31, 1983. CNB supplied Benton with the balance figures for land and building indebtedness. Mr. Matis alone supplied the livestock numbers and valuation figures at least until the reports prepared for 1982 and 1983, when CNB contributed some information. Benton indicated he informed Mr. Matis of the information received from CNB prior to utilizing it in his statement preparation. In order to make his yearly statements as accurate as possible, Benton correlated the information received from both CNB and Mr. Matis. Benton did not note discrepancies between the numbers supplied by either CNB or Mr. Matis, and Mr. Matis never indicated that any figures supplied by CNB were incorrect. Livestock owned by Debtors for the year ending 1982 totaled 450 animals; at the end of 1983, 683 head. Debtors never disclosed to Benton Armistead's partnership interest in any of these animals, although Benton was aware Debtors leased the Chapman Farm cows from Armistead.

David Nolan ("Nolan"), the President of CNB, testified he was familiar with Debtors' credit file due to his role as a member of the bank's loan committee. Received into evidence during the course of his testimony were three credit memos, and one copy of minutes of the meeting of CNB's Directors' Discount Committee. The credit memos, prepared by CNB employee John E. Doyle ("Doyle"), referenced Debtors' and Armistead's various financial dealings.

One credit memo, dated February 18, 1977, (Debtors' Ex. 6, rec'd December 10, 1986), and apparently directed to Mr. Matis' credit file, detailed Mr. Matis' farming operations for the preceding year, and his future plans. Doyle indicated Mr. Matis planned to maintain a smaller operation on two farms, "[o]ne owned by Mohawk Valley Commission Sales and the Palatine Stock Farm which is rented on a long-term lease. There is a dairy herd at the Palatine Stock farm in which we have no interest." As indicated, the Palatine Stock Farm herd was renamed Dutch Treat Farms.

On March 3, 1978, Doyle wrote a credit memo (Debtors' Ex. 7, rec'd December 10, 1986) in which he indicated:

The Palatine Stock Farm has been leased for several years by Paul Matis and Charlotte Symons [Matis] for $400. per month. Cattle are leased from Phil Armtstead [sic] for $200. per month for forty head. In addition animals from Paul's main herd are housed and milked here. We have no interest in the leased herd.

The minutes of the CNB Directors' meeting held on April 22, 1981 (Debtors' Ex. 5,

rec'd December 12, 1986) concerned Debtors' $75,000.00 loan request. The minutes reflect discussion of Debtors' financial condition and asset ownership, and at this meeting "Mr. Nolan pointed out that the Nellis farm operation was a joint venture with our customer and Mr. Phil Armstead, [sic] who also endorses on several obligations."

Nolan testified he was never aware of any partnership between Debtors and Armistead. He used the term "joint venture" to indicate that Armistead had guaranteed Mr. Matis' debt to CNB, and that there was some degree of financial "interdependence" between the two. It had earlier been established that the Dutch Treat herd was quartered at what at one time had been known as the Nellis farm.

Paul Hoffman ("Hoffman") qualified as an expert witness for purposes of providing his opinion of equipment values. Hoffman had prepared an appraisal as of April 25, 1986, (Petitioner's Ex. 6, rec'd September 18, 1986), which the parties originally stipulated to as listing the items of equipment securing the CNB indebtedness. After foundation was laid, the appraisal was admitted for the additional purpose of establishing equipment values as well. At the time he testified (December 11, 1986), Hoffman stated the values reflected on the appraisal were, in the main, still accurate. The only difference concerned a 1973 John Deere 4630 Tractor (4 wheel drive) originally appraised at $12,000.00. As of December 8, 1986, the tractor had a current value of $4,000.00 due to damages incurred since Hoffman's initial inspection. The reduction in the tractor's value reduced the total liquidation value of the equipment to $41,400.00. Hoffman stated that equipment values are generally greater in spring than in mid-winter, and that had the items been sold at auction when originally appraised, approximately $55,000.00 could have been raised.

Mr. Matis disputed Hoffman's testimony concerning necessary tractor repairs. Based upon his experience with the repair of farm equipment, and what a friend told him, the tractor could be repaired for approximately $1,000.00.

Armistead qualified as an expert of the value of dairy animals, based upon his extensive experience and current involvement in the dairy industry. Armistead opined that Dutch Treat Farm cows would bring $750.00 apiece at auction, while heifers of this herd would garner $350.00. For grade holstein cows kept at what is known as the Seeley Farm, $500.00 was Armistead's expert opinion as to value. The auction value of $500.00 per grade holstein cow was given for those animals kept at what is known as the Sweet Farm. Grade heifers were valued at between $250.00 to $300.00. Registered calves were valued at $200.00, with grade calves valued at $50.00 to $75.00.

Petitioner's Ex. 14, (received Dec. 11, 1986) set forth the inventory of the total livestock owned by the Debtors as of December 10, 1986. Utilizing Armistead's valuation figures, the value of the livestock is as follows:

DUTCH TREAT FARM

| | | |
|---|---|---|
| Cows | | |
| 45 @ $750.00 | | = $33,750.00 |
| Heifers | | |
| 32 @ $350.00 | | = $11,200.00 |
| Calves | | |
| 19 @ $200.00 | | = $ 3,800.00 |
| | Total | $48,750.00 |

SEELEY AND SWEET FARMS

| | | |
|---|---|---|
| Cows | | |
| 60 @ $500.00 | | = $30,000.00 |
| Heifers | | |
| 8 @ $300.00 | | = $ 2,400.00 |
| Calves | | |
| 7 @ $75.00 | | = $  525.00 |
| | Total | $32,925.00 |

If Armistead's lower valuation figures for the Seeley and Sweet Farms heifers and calves are used, these herds have a total value of $32,350.00.

Mr. Matis testified that after six months of operation as a Chapter 11 debtor-in-possession, the Debtors had total cash on hand of $1,145.57. Upon the filing of the Chapter 11 petition, this figure had been $250.00. Part of the Debtors' income for the six months of operation was attributable to sale of Dutch Treat Farms animals in August, 1986 in amount of $2,300.00. Ar-

mistead had not received any portion of the sale proceeds.

Mr. Matis stated that farming income and expenses fluctuate over the course of a year. During spring, expenses rise for such items as crop planting and machinery repair.' Such expenses are not incurred during the winter months. He stated Debtors have what is known as a "fall herd", for the greatest milk production is expected from December onward; the months of September, October, and part of November would be "stale", or lower production, times.

Debtors offered adequate protection payments to CNB of $1,000.00 per month. Beyond Mr. Matis' enthusiastic expectations for future income,[2] the Debtors offered no proof of an ability to make such payments.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and § 157(b)(1) and (2)(G).

Three primary issues have been raised as a result of the evidence presented. First, what was Debtors' and Armistead's relationship with respect to the Dutch Treat herd. Second, how did this relationship affect the "after-acquired property" security interest which Debtors had granted to CNB. Third, to what extent did CNB's acknowledgment of Armistead's interest in the Dutch Treat herd affect its claim to a security interest in these animals by virtue of the "after-acquired property" clauses.

Prior to analyzing the specific facts of this case, it is useful to review certain legal principles serving as parameters for consideration. The Court recognizes the general law concerning the creation and existence of a partnership is applied with reference to the law of New York State. *Wild v. Commissioner*, 62 F.2d 777, 778–79 (2d Cir. 1933). The obvious starting point is hence the New York Partnership Law, §§ 1–120e

(McKinney 1948 & Supp.1987) ("Partnership Law"). Partnership Law § 10, subd. 1, defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Partnership Law § 11, subd. 1, makes clear that "persons who are not partners as to each other are not partners as to third persons." This latter section, at subdivisions 2–4 therein, sets forth rules for determining whether a partnership exists.

New York case law supplements the codified provisions, requiring the burden of proving the partnership's existence be borne by the party advancing its existence. *Allen Chase & Co. v. White, Weld & Co.*, 311 F.Supp. 1253, 1259 (S.D.N.Y.1970); *Ramirez v. Goldberg*, 82 A.D.2d 850, 852, 439 N.Y.S.2d 959 (N.Y.App.Div.2d Dep't.1981); *Moscatelli v. Nordstrom*, 40 A.D.2d 903, 377 N.Y.S.2d 575 (N.Y.App.Div.3d Dep't. 1972) While a written contract is not a necessary precondition to the existence of a partnership, the absence of a formal document is one element weighing against a finding that a partnership existed. *Hanlon v. Melfi*, 102 Misc.2d 170, 173, 423 N.Y.S.2d 132 (N.Y.Sup.Ct.1979). Yet, whether the parties' arrangement is memorialized in writing, or is merely the product of an oral understanding, the primary focus is whether the "partners" evidenced *intent* to become partners to each other, and to those third parties with whom they dealt. *Beckerman v. Sands*, 364 F.Supp. 1197, 1199 (S.D.N.Y.1973); *Salter v. Ham*, 31 N.Y. 321, 327 (1865). Of course, when the parties have failed to manifest this intent in writing, a partnership at will is created, terminable by any partner at any time. *Pace v. Perk*, 81 A.D.2d 444, 457, 440 N.Y.S.2d 710 (N.Y.App.Div.2d Dep't. 1981); *Malmeth v. Schneider*, 18 A.D.2d 1030, 238 N.Y.S.2d 986 (N.Y.App.Div.2d Dep't 1963); *See* Partnership Law § 62, subd. 1(b).

---

**2.** MR. MATIS: "... From now on, we're ready to go. Cows are calving out good and they are doing good. I'm really looking forward to it with enthusiasm.
MR. MARTIN: Do you anticipate your income to increase, then?

MR. MATIS: Oh, definitely. Vastly.
MR. MARTIN: Do you expect that it's going to increase sufficiently so you will be able to make the $1,000.00 payment a month?
MR. MATIS: With no problem.

If the partnership is the result of an oral understanding, the Court is constrained to rely upon the testimony of witnesses. *Hanlon v. Melfi, supra.* The Court looks to whether the parties have expressed the requisite intent to establish a partnership by act and deed, and further examines the character in which the "partners" have regarded the relationship. This examination necessarily involves consideration of circumstantial evidence. *Martin v. Peyton,* 246 N.Y. 213, 217, 158 N.E. 77 (1927); *In re Wells' Will,* 36 A.D.2d 471, 475, 321 N.Y. S.2d 200, (N.Y.App.Div. 4th Dep't.1971) *aff'd.* 29 N.Y.2d 931, 329 N.Y.S.2d 322, 280 N.E.2d 95 (1972); *Goldberg v. Goldberg,* 276 App.Div. 1084, 95 N.Y.S.2d 777 (N.Y. App.Div.2d Dep't.) *reh'g denied,* 277 App. Div. 782, 97 N.Y.S.2d 398 (1950); *Missan v. Schoenfeld,* 111 Misc.2d 1022, 445 N.Y.S.2d 856 (N.Y.Sup.Ct.1981).

Consequently, the facts herein are sifted to determine whether the Debtors and Armistead intended to enter into an agreement of partnership, for the existence of such a contract is elemental to the claim. *Longon Assurance Corp. v. Drennen,* 116 U.S. 461, 470, 6 S.Ct. 442, 443, 29 L.Ed. 688 (1886); *Corr v. Hoffman,* 256 N.Y. 254, 272–73, 176 N.E. 383 (1931); *Martin v. Peyton, supra.* By their agreement, the parties must have intended to share the profits and assume the losses of their business venture. *See, e.g. Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958); *Pattison v. Blanchard,* 5 N.Y. 186, 188–89 (1851); *M.I.F. Securities Co. v. R.C. Stamm & Co.,* 94 A.D.2d 211, 463 N.Y.S.2d 771, (N.Y.App.Div. 1st Dep't.), *aff'd.,* 60 N.Y.2d 936, 471 N.Y.S.2d 84, 459 N.E.2d 193 (1983). The sharing of profits is prima facie evidence of a partnership, unless the installment payments are merely made to pay off an outstanding debt. Partnership Law § 11, subd. 4(a).

▇ The evidence discloses that Debtors and Armistead did not, by their conduct, evidence an intention to share the profits generated by the Dutch Treat herd. Debtors' proof reveals only one documented occasion of an equal sharing of the proceeds from the sale of an animal. While Armi-

stead testified that other instances of profit sharing had occurred during the course of the relationship, no evidence substantiating the statement was offered. Armistead stated that some 50 to 60 cows would have been disposed of over the life of the herd, yet the profit disposition from only one transfer is documented. Additionally, while the $800.00 per month payment was said to represent Armistead's interest in partnership profit, no plausible explanation was advanced as to how the figure was arrived at. This set, monthly payment remains constant, irrespective of herd milk production, sales, or other income producing activities. Further, the monthly payments are exactly as those to be paid by Debtors under the terms of the promissory note. While Armistead advanced other reasons for the note's execution, it is apparent the monthly payments represent not the sharing of partnership income, but rather the repayment of an indebtedness by Debtors. *See Martin v. Peyton, supra.*

The execution of the promissory note by Debtors itself raises serious doubts that the parties intended a partnership association. The testimony adduced revealed the note was executed to evidence not only Armistead's capital contributions to the "partnership", but other monies that he loaned to the Debtors. It has been noted that the lending of money by one "partner" to another for the purpose of conducting the partnership business, negates the inference of a partnership relationship. *Smith v. Maine,* 145 Misc. 521, 531, 260 N.Y.S. 409 (N.Y.Sup.Ct.1932).

Based upon the entire record, the Court holds that there was not a partnership relationship between Armistead and Debtors. In addition to the factors listed above, the Court finds compelling the following: 1) the failure of either Debtors or Armistead to file with the Clerk of Montgomery County a notice of an intention to conduct business as a partnership 2) the absence of the filing of state and federal partnership tax returns; 3) Armistead's treatment of the monthly payment as "interest" income for tax purposes; 4) the existence of a formal written agreement between Debtors and Armistead for the lease of the Chapman

Farm herd; 5) Armistead's failure to re-member receiving the draft partnership agreement from Mrs. Matis; 6) Debtors' failure to produce the draft partnership agreement presumably within their control; 7) Debtors' failure to acknowledge the existence of the partnership to their accountant at any time during the course of their relationship; 8) Debtors' insuring of the Dutch Treat herd without reference to the partnership; 9) Armistead's failure to declare a partnership interest in the Dutch Treat herd during the course of his business dealings with the other local businesses; 10) Debtors' failure to divulge a partnership interest on the schedules filed in connection with this case.

The Court gives little weight to the evidence regarding the "partnership" filing with the Association. The testimony clarifies that the Association did nothing to confirm the veracity of representations to it concerning the legal relationship of partnership applicants. This is proper as the Association's purpose is not to validate ownership of animals, but rather to insure pedigree registration. Debtors admitted that the Dutch Treat herd, as registered, contains animals owned not by the partnership, but by third parties. Further, Mr. Matis testified he failed on a number of occasions to re-submit registration on newly acquired animals so as to avoid payment of additional fees. While monetary considerations may have been paramount, the failure to provide the Association with correct information on these occasions undermines Debtors' argument that their earlier representations are entitled to great merit and consideration.

What the record does reflect is that, at best, Debtors and Armistead were engaged in a joint venture as respects the Dutch Treat herd. While the lines between these two forms of legal relationship are generally blurred, a joint venture is "a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." *Forman v. Lumm*, 214 App.Div. 579, 583, 212 N.Y.S. 487 (N.Y.App.Div. 1st Dep't.1925). Primary distinguishing characteristics include

a more limited agency authority to act on behalf of other joint venturers, *Wrenn v. Moskin*, 226 App.Div. 563, 566–67, 235 N.Y.S. 405 (N.Y.App.Div. 1st Dep't.1929), and a concentration upon a single transaction (perhaps lasting over several years) rather than the general business of a particular kind. *See generally* 16 N.Y.Jur.2d *Business Relationships* § 1578 (1981).

Yet irrespective of the nature of Debtors' and Armistead's association, the next inquiry concerns whether CNB, by virtue of the "after-acquired property" clause of its security agreements with Debtors, has a security interest in the Dutch Treat herd. In this regard, the Court finds guidance in the case of *Brown v. United States*, 622 F.Supp. 1047 (D.S.D.1985).

In *Brown*, the debtor and plaintiff entered into an agreement whereby the former would purchase cattle with the latter's funds, and then re-sell at a higher price with the profits to be split. Fifty unbranded head were purchased for the sum of $20,000.00, and debtor placed the animals in a field with others owned by him. The plaintiff gave debtor complete discretion on the proposed sale, and on one occasion, allowed debtor to use some of the animals to satisfy a personal debt.

At the time of the transaction, the Farmers Home Administration ("FmHA") held a security interest in debtor's livestock, with the security agreement including an "after-acquired property" clause. At the urging of FmHA, debtor liquidated all the cattle in his possession, and turned over all proceeds as payment upon his debt. When plaintiff learned of the sale, he demanded that FmHA return his $20,000.00. The question presented the court was whether debtor had had sufficient rights in the cattle so that the security interest of FmHA attached.

While the plaintiff and debtor both stated that plaintiff was to "own the cattle", the court believed this testimony to be outweighed by debtor's unbridled discretion in purchasing and selling the cattle, and the failure of either party to inform outsiders of plaintiff's alleged ownership interest.

With reference to the Official Comment to § 9–202 of the Uniform Commercial Code, the court noted that even had the plaintiff established ownership, that fact would not have affected the attachment of FmHA's security interest in the cattle.

> Even if a party retains ownership in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his "rights" of possession and control over the collateral. It is the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral. (emphasis in original).

*Id.*, 622 F.Supp. at 1050.

Recognizing that "mere possession of collateral . . . does not give the debtor sufficient rights for a security interest to attach," *Id. quoting Rohweder v. Aberdeen Production Credit Ass'n*, 765 F.2d 109, 112 (8th Cir.1985), the court held that a debtor must in fact have some ownership interest in the collateral. The court's subsequent analysis of the facts led it to conclude that FmHA was entitled to all the proceeds of the sale.

■ In the present case, neither party disputes that Debtors have some manner of ownership interest in the Dutch Treat herd. Were ownership the sole consideration, this matter would be readily resolved. However, as the *Brown* decision makes clear, the Court must consider what the secured party knew of the conflicting claim to the collateral and what was the parties' intent with respect to a security interest in the collateral. The Debtors presented evidence that CNB disclaimed any interest in the Dutch Treat herd, and Nolan testified that while the bank was aware that Armistead had some involvement with the Debtors' business operations, the exact nature was uncertain.

The Court believes the question is resolved by looking to what the parties intended the security interest of CNB to attach to. "[T]he requirement that there be 'rights in the collateral' illustrates the general principle that 'one cannot encumber another man's property in the absence of consent, estoppel or some other special rule'." *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 436 (7th Cir.1980) *quoting First Nat. Bank and Trust Co. of Augusta v. McElmurray*, 120 Ga.App. 134, 138, 169 S.E.2d 720, 724 (1969). The evidence does not suggest that Armistead consented to the use of his interest in the Dutch Treat herd to serve as collateral for Debtors' dealings with CNB. Nor can CNB rely upon the doctrine of estoppel, for while Debtors—by word, conduct, or silence—could not have induced CNB to believe the Dutch Treat herd served as collateral, CNB must have been ignorant of the true state of affairs. CNB would have to show it would not have acted but for the actions of the Debtors. *Matter of Pubs, Inc. of Champaign, supra*, 618 F.2d at 438. The internal memoranda prepared by CNB indicate the secured party did not believe the Dutch Treat herd secured its obligations. In this regard, the Court questions Nolan's explanation for his use of the term "joint venture" in Ex. 5. Surely, the president of a bank should realize that the term denotes a particular form of legal relationship beyond the mere guarantee of a debt.

While Debtors may have failed to reveal the nature of their relationship with Armistead, CNB did not intend that the Dutch Treat herd should serve as collateral. CNB had notice of Armistead's involvement, and it should have inquired further if in fact it intended the Dutch Treat herd to secure the Debtors' obligations. The Court believes CNB never acted because it never intended the Dutch Treat herd to serve as collateral. Consequently, the Court holds that CNB does not have a claim secured by an interest in the Debtors' Dutch Treat herd.

■ Having determined that CNB does not have an interest in the Dutch Treat herd, the final consideration is whether Debtors have provided sufficient proof of the adequate protection of CNB's interest in the collateral which does secure a portion of its claim. CNB established that

Debtors do not have equity in the equipment and the non-Dutch Treat herd animals. Code § 362(g)(1). Debtors' proof of adequate protection, on the other hand, is grossly insufficient. More than Debtors' bald assertions of anticipated revenue and a future ability to pay are necessary to sustain the burden. The Debtors' past cash flow would have been insufficient to meet the proposed payments, and no solid evidence was presented which indicated this was likely to change. Consequently, the lack of proof has left the Court little option but to grant CNB the relief it seeks with respect to non-Dutch Treat animals and the equipment. The automatic stay is modified to allow CNB to proceed to enforce its rights against this collateral.

Judgment consistent with the above shall be entered upon submission by CNB. The foregoing constitutes findings of fact and conclusions of law pursuant to Fed.R. Bank.P. 7052.

IT IS SO ORDERED.